**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Thomas F. SCAFE, Defendant-Appellee.**

**No. 85–2442.**

United States Court of Appeals, Tenth Circuit.

June 15, 1987.

Ira R. Kirkendoll, Asst. Federal Public Defender, D. Kan., Kansas City, Kan. (Charles D. Anderson, Federal Public Defender, D. Kan., Kansas City, Kan., was also on the brief), for defendant-appellant.

Richard L. Hathaway, Asst. U.S. Atty., Topeka, Kan. (Benjamin L. Burgess, Jr., U.S. Atty., Topeka, Kan., was also on the brief), for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, and BARRETT and SEYMOUR, Circuit Judges.

HOLLOWAY, Chief Judge.

Defendant-appellant Scafe appeals his conviction and life sentence for murder in the first degree in violation of 18 U.S.C. § 1111(a) (1984 and 1986 Supp.). On appeal, his main contentions are that the trial court erred (1) when it refused to instruct the jury on the lesser included offense of voluntary manslaughter; (2) when the judge denied Scafe's motion to disclose the identity of two confidential Government informants; and (3) when the court permitted the Government to introduce written statements of the defendant, which had not been produced pursuant to Rule 16(a)(1)(A), F.R.Crim.P., and the open file policy adopted by the Government in this case.

## I

### The factual background

Considering the evidence in the light most favorable to the Government, as we must at this juncture, it tended to show the following:

A conflict arose between defendant Scafe and the murder victim, James D. Bryson, who were both inmates at the United States Penitentiary, Leavenworth, Kansas. The immediate controversy apparently started when Scafe asked Bryson to turn down his radio which was disturbing Scafe, and Bryson took offense. Bryson had been telling inmates that he was having problems with Scafe and was going to have to do something about him. He also had been calling Scafe highly derogatory names, referring to him as a "punk" which had connotations that Scafe was a homosexual or a very weak individual.

The problem escalated and on March 19, 1985, at around 5:30 p.m., Bryson told Scafe he had better check into 63, a protective custody unit within the prison, and that "I am going to kill you." Testimony on this statement was given by defense witness inmate Biggs. III R. 160–161. Scafe took the stand and testified that Bryson had told him the next time he saw him, "he was going to kill me." III R. 248. Scafe said that Bryson's exact words were "If I see you again, white boy, I am going to kill you." III R. 249.

Shortly after Bryson's threat to Scafe, Scafe said that he returned to his cell. Scafe decided that the controversy between him and Bryson would be resolved that night. He packed his personal belongings, anticipating that he would either be dead or placed in the segregation unit in building 63 that night. He then secured his eyeglasses by attaching a rubber band to them, which he placed around his head. Finally he obtained a shank or homemade knife from a hidden cache in the cellblock and awaited Bryson's return. III R. 248–54, 262–67.

Later that evening of March 19, Bryson returned early from his college classes to "D" cellhouse where he and Scafe resided, eight cells apart. Bryson stood talking with another inmate. At approximately 7:30 p.m., Scafe rushed up behind Bryson and stabbed him. Bryson fell and then got up and Scafe pursued him, stabbing Bryson as he ran. After Bryson fell to the ground for the final time, Scafe stabbed him in the chest, leaving the knife there, and then surrendered to the correctional officers nearby. Bryson died shortly thereafter in the prison hospital from exsanguination. Scafe had inflicted twenty stab wounds, seven of which were of a nature to have caused death. The assault took place on the main floor of D cellhouse before several witnesses, including some correctional personnel and inmates.

During Scafe's testimony in his defense he said that Bryson had insulted him on numerous occasions and that on the evening of March 19, Bryson threatened his life. III R. 251. Bryson had said "check in tonight" and "if I see you again, white boy, I am going to kill you." *Id.* at 248–249. Bryson felt that checking into the protective custody unit 63 was not right because putting yourself into protective custody meant being labeled as an informer and it is "open season on you." *Id.* at 249.

Scafe testified further that he next saw Bryson at approximately 7:10 p.m. and was surprised because he thought Bryson would be in his college classes until about

8:30 p.m. III R. 253. He assumed that Bryson was looking for him and was waiting to carry out his threat and attempt to kill Scafe. Scafe said that when he went downstairs and confronted Bryson, he was scared to death, that he "was planning to kill him" at that time, that he felt he had no other options, and that this was his only alternative to save his life. *Id.* at 260–63, 267.

Charles Marts, an inmate, testified for Scafe. He said that on about January 4, 1985 Bryson said to Marts that he had been having trouble with a white man named Tom and that he was going "to have to do something to him ..." III R. 141. Inmate Crabtree also testified that Bryson was very aggressive toward people, that Crabtree himself had an altercation with Bryson, and that the night Bryson was killed, sometime between 5:00 and 6:00 he saw Bryson walk up to Scafe and Bryson told Scafe to get off the yard, check in, and that if he didn't, he would kill Scafe. *Id.* at 176–77.

Another inmate, Bond, testified that about 5:30 on the evening of March 19, 1985 he was standing on the stairwell and Bryson accosted Scafe and started loud talking in that area. Bond said that Bryson told Scafe if he was not off the compound by 10:00, Bryson would kill Scafe, calling him several derogatory names. III R. 193–94. Inmate George Scalf also testified that Bryson had made a threat on

Scafe's life earlier the evening of the homicide. *Id.* at 205, 207.

The Government offered Ex. 21 (App. 1). This was a letter said to have been written by Scafe outlining the testimony he wanted on the threats and the like from inmate witness Scalf. The Exhibit was admitted over objection.

The Government witness, Dr. Jensen, is a board certified pathologist. He performed an autopsy on Bryson. He identified twenty entry stab wounds and two exit stab wounds. Eight wounds were discussed and all but one of these were of a sufficient nature, especially those that penetrated the heart, to have caused death. II R. 99. He said that Bryson's death was caused by exsanguination from multiple stab wounds to the heart and lungs. *Id.* at 103.

The trial judge gave instructions on the elements of the first degree murder offense and second degree murder and on the self-defense theory.

After deliberation of about a day and a half, the jury found defendant guilty of first degree murder and he was sentenced to life imprisonment. This appeal followed.

## II

### Voluntary manslaughter instruction

At a hearing on proposed instructions, the defendant requested that an instruction on the lesser included offense of voluntary manslaughter be given.[1] *See* 18 U.S.C.

---

1. Defendant requested the standard Devitt & Blackmar instruction on voluntary manslaughter which reads in pertinent part:

**Verdict—Manslaughter—When Appropriate**

Section 1112 of Title 18 of U.S.C.A. defines manslaughter as follows:

"Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

Voluntary—Upon sudden quarrel or heat of passion.

. . . . .

The heat of passion, which will reduce a murder to manslaughter, must be such passion as would be aroused naturally in the mind of the ordinary reasonable person under the same or similar circumstances, as shown by the evidence in the case.

Neither the passion of fear, in and of itself, nor the passion for revenge, in and of itself, nor the passion induced by and accompany-

ing or following an intent to commit a felony, in and of itself, nor any combination of any one or more or all of these passions, in and of themselves, constitutes the heat of passion which will reduce a murder to manslaughter. It is true that the emotions just mentioned may be involved in a heat of passion such as substitutes impulse and rashness for judgment; but it is also true that such emotions may exist in the mind of a person who acts deliberately, and from choice, following his own reasoning, however good or bad that reasoning may be.

The law does not permit a person to set up his own standard of conduct, or to justify or excuse himself, merely because his passions were aroused, unless the circumstances in which he was placed, and the facts with which he was confronted, were such as would have aroused the passion of the ordinary reasonable person, similarly situated. So, the test to

§ 1112. III R. 292–93. The court denied this request on the basis that there was no evidence of voluntary manslaughter. *Id.* at 193. The judge did, however, agree to instruct on the lesser included offense of second degree murder. *See* 18 U.S.C. § 1111(a). *Id.*

 Voluntary manslaughter is a lesser included offense of murder. It is the unlawful killing of a human being without malice upon a sudden quarrel or heat of passion. 18 U.S.C. § 1112(a). Manslaughter differs from first degree murder in that there is no element of "malice aforethought." Malice is negated by the heat of passion. *United States v. Lofton,* 776 F.2d 918, 920 (10th Cir.1985). Where there is evidence of circumstances exciting in the defendant's mind a sudden passion, either of rage or fear, it can be found that there was a willful and unlawful killing, but at the same time one without malice, and thus manslaughter and not murder. *Stevenson v. United States,* 162 U.S. 313, 322, 16 S.Ct. 839, 842, 40 L.Ed. 980 (1896). Further, self defense and voluntary manslaughter instructions are not always inconsistent. *Id.* at 322–23, 16 S.Ct. at 842–43; *United States v. Manuel,* 706 F.2d 908, 915 (9th Cir.1983); *Kinard v. United States,* 96 F.2d 522, 526 (D.C.Cir.1938).

 A defendant is entitled to jury instructions on any theory of defense finding support in the evidence and the law. Failure to so instruct is reversible error. *United States v. Lofton,* 776 F.2d at 920. Thus, when a defendant presents evidence supporting a theory of defense, the trial court should refer to that theory and to the testimony bearing on it and submit the issue with an instruction on the applicable law. The jury should be advised of the defendant's position so as to put the issues raised by the theory of defense squarely before it. *United States v. Lofton,* 776 F.2d at 920.

 Defendant contends that the trial court's failure to give a voluntary manslaughter instruction constituted plain error because it relieved the prosecution of its burden to prove every element of the offense beyond a reasonable doubt and left the jury free to convict without proper instruction on the essential element of intent, *i.e.,* that the killing was committed with malice. While it is true that in order to obtain a murder conviction, the prosecution must "prove beyond a reasonable doubt the absence of the *heat* of passion on sudden provocation *when the issue is properly presented in a homicide case,"* *Mullaney v. Wilbur,* 421 U.S. 684, 704, 95 S.Ct. 1881, 1892, 44 L.Ed.2d 508 (1975) (emphasis added), we do not find that the issue was properly presented in this case.

Defendant points to his testimony regarding his reaction to the remarks made to him by the victim which implied that he was a homosexual or a weak individual, the threats made against his life, and finally to his testimony that while in the act of stabbing Bryson he went into a kind of "frenzy" and felt "scared to death." III R. 245–46, 248–50, 255, 276–77. His ultimate explanation for the killing was that after Bryson threatened his life, on the evening of the murder, he reached the conclusion that "enough was enough," that his previous way of dealing with Bryson, ignoring his remarks, had not and would not work," *Id.* at 250–51, and that his only alternative was to "take care of Mr. Bryson before Mr. Bryson took care of [him]." *Id.* at 263.

On this record we are unable to discern any reasonable basis on which a jury could return a verdict of voluntary manslaughter, an unlawful killing without malice. *See* 18 U.S.C. § 1112(a). While there was some suggestion of rage or fear as a basis for heat of passion, the defendant's own testimony on his mental processes and preparations, III R. 251–52, the delay after the victim's remarks until the planned attack was made, and the uncontradicted evidence indicating malice by the repeated

be applied, in determining whether a killing was in the heat of passion which will reduce a murder to manslaughter, is whether or not, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinary reasonable person to act rashly and without deliberation and reflection, and from such passion, rather than from judgment.

brutal stabbings, together reveal a record which could not serve as a basis for a voluntary manslaughter finding.[2] Thus we find no merit in this claim of error in the instructions.

## III

### Identity of Government informants

In the course of the Government's investigation, numerous inmates were interviewed. Two inmates gave statements that the Government viewed as reliable. They were identified by code letters and numbers LVN 85–58 and LVN 85–68. Prior to trial the defendant moved for the disclosure of their identities and for subpoenas for them, arguing that their statements were exculpatory and corroborative of the defendant's self-defense theory. I R. 22–24. He reiterated this request at trial. II R. 40–43; III R. 285. The Government argued that disclosure of the informants' identities would place them at risk as evidenced by a letter Scafe wrote to another inmate, see App. 1, and that the statements of the informants were cumulative and did not support defendant's self-defense theory. II R. 44; III R. 286. The court denied the motion on the basis that the statements were cumulative. II R. 46, III R. 286–87. The defendant's motion to disclose Government informants had also requested the disclosure of the identity of one additional informant, LVN 85–57; however, the identity of this informant, Tubbs, was disclosed by the Government and he was produced as a Government witness at trial and no complaint about the handling of that disclosure is made on appeal.

In *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), the Supreme Court held that an informant's identity must be revealed whenever it would be relevant and helpful to an accused's defense or "essential to a fair determination of a cause." 353 U.S. at 60–61, 77 S.Ct. at 628. Where the Government opposes disclosure of the identity of an informer, a trial judge must balance the public's interest in protecting the flow of information against the individual's right to prepare his defense. *Id.* at 62, 77 S.Ct. at 628. The Court did not formulate a fixed rule, stating: "Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.*

In applying the *Roviaro* standard, this court has held that mere speculation about the usefulness of an informant's testimony is not sufficient. *United States v. Zamora*, 784 F.2d 1025, 1030 (10th Cir. 1986); *United States v. Halbert*, 668 F.2d 489, 496 (10th Cir.), *cert. denied*, 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 453 (1982). Disclosure of an informant is not required where the information sought from him would be merely cumulative, or where the informant is not a participant in the transaction in question. *United States v. Reardon*, 787 F.2d 512, 517 (10th Cir.1986); *United States v. Perez-Gomez*, 638 F.2d 215, 218 (10th Cir.1981). Where a defendant makes no showing that disclosure would be helpful to the defense, and where the information provided by the informant is merely cumulative and was not neces-

---

**2.** We are mindful of possible inconsistency in the giving of the self-defense instruction on the basis of the testimony of fear of Scafe for his life, and the denial of the voluntary manslaughter instruction on the ground that there "just is no evidence of voluntary manslaughter ..." as the trial judge stated. III R. 293. The judge questioned whether there was evidence of second degree murder, but said he would submit that charge, but not one on voluntary manslaughter. *Id.*

We agree with the trial judge that there was no basis for a voluntary manslaughter instruction because of a lack of evidence of "a sudden

quarrel or heat of passion." 18 U.S.C. § 1112(a). The giving of the self-defense charge, which likewise appears to have a tenuous basis, does not *ipso facto* demonstrate reversible error in the denial of the voluntary manslaughter instruction. *United States v. Skinner*, 667 F.2d 1306, 1310 (9th Cir.1982), *cert. denied*, 463 U.S. 1229, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983), discusses the availability of both the self-defense and voluntary manslaughter theories in a shooting homicide case; but the case does not demonstrate error here in the denial of the voluntary manslaughter charge.

sary to the presentation of the Government's case, no error results from the refusal to reveal the informant's identity. *United States v. Sherman,* 576 F.2d 292, 296 (10th Cir.), *cert. denied,* 439 U.S. 913, 99 S.Ct. 284, 58 L.Ed.2d 259 (1978). However, it is error of constitutional dimension to deny disclosure solely because of the potential danger to the informant. If disclosure is essential to a fair determination of the case, the trial court may require disclosure and if the Government withholds the information, dismiss the action. *United States v. Ordonez,* 737 F.2d 793, 809 (9th Cir.1984). *See also Gaines v. Hess,* 662 F.2d 1364, 1368 (10th Cir.1981).

■ We agree with the ruling of the district court that the statements were cumulative and hold that there was no error in denying the motion for information on the identities of the two witnesses in question and the subpoenas for them. The summary of the interview with unidentified inmate LVN 85–58 demonstrates that it

3. Attached to the defendant's motion to disclose Government informants were investigative reports furnished to the defendant by the office of the United States Attorney. The pertinent parts are summarized below in this footnote and that which follows concerning the two informants in question.

The investigative report summarizes the interview with informant LVN 85–58 generally as follows. The informant said that about a month earlier, inmate Bryson was playing his radio very loud late at night and the informant eventually heard a loud argument. Inmate Scafe told the informant details regarding the incident and that Scafe told him that he had said to Bryson "Look man, you're radio is too loud, please turn it down ..." Inmate Bryson had responded "You piece of shit, this is my radio, I play it the way I want ..." The informant said that Scafe later told him that Bryson had talked pretty rough and that he "must think I'm a pussy because I didn't hit him." Scafe said that Bryson had been talking to him, "like a punk," and that Scafe wouldn't do anything. About two weeks later Scafe brought up the subject again, indicating that Bryson "aggravates me ... keeps on talking about me."

The informant said that he heard a rumor that at one point Bryson had told Scafe "I'm going to kill you at 10:00 p.m. On the night of the incident Bryson got a low grade in his college class and stormed out, going to the commissary, griping about white people and then Bryson went back to the unit. About this time Scafe went to his cell, stayed a couple of minutes and then left. The informant had no actual conversations with Scafe that night. Because

was generally cumulative information, with no really additional potential evidence.[3] We likewise find no error in the refusal to disclose the identity of informant LVN 85–68, whose statement was also essentially cumulative and revealed no substantial additional information.[4]

In sum, we hold that the district court did not err in his ruling denying the motion requesting the identities of the informants and subpoenas for them.

## IV

### The admission of Defendant's statements, Exhibits 21 and 22

Defendant further contends that the district court erred when it admitted two Government exhibits. Exhibit No. 22 was a letter from the defendant to his father which had been intercepted by prison officials, opened, photocopied and sent on to the addressee. *See* Appendix 2. The letter was admitted during the Government's

information provided by the informant was generally corroborated by other known intelligence, the informant was viewed as being reliable. I R. 27.

4. The investigative summary concerning LVN 85–68 stated substantially the following concerning his interview:

In an investigative interview in May, 1985 LVN 85–68 indicated he had heard an argument between Scafe and Bryson three or four weeks before the homicide. The informant said that he observed Scafe walk by the informant's cell on the way to Bryson's cell and he observed Bryson tell Scafe "if you ever touch me again, I'll kill you." Informant LVN 85–68 said that Bryson placed his hand on Scafe's shoulder as he made this statement and Scafe replied, "I'm sorry ..." and Bryson again repeated his position, saying "Well, I'm just letting you know, if you ever touch me again, I will kill you."

LVN 85–68 said he is not positive what the issue was, but it was his understading the incident started over Bryson's playing his radio loud at night and that an argument erupted between Scafe and Bryson over this. The informant describes Scafe as a fairly quiet inmate and describes Bryson as often getting into arguments with other inmates over minor issues such as use of the washing machine, etc. The informant had not provided information previous to the incident, but it was noted that the information given in this instance was generally corroborated by other intelligence and thus LVN 85–68 was viewed as being reliable.

cross-examination of defendant Scafe to undermine the credibility of his self-defense theory. Government Exhibit No. 21, *see* Appendix 1, was a letter sent by defendant, while awaiting trial, to a fellow inmate in the segregation unit. It was taken from another inmate acting as a courier for defendant. This exhibit was admitted during cross-examination of defense witness Homer, the inmate who was carrying the letter for defendant. It was used to show "the design and plan between the inmates to communicate and fabricate a story." III R. 226–28. It was clearly damaging to defendant, as Appendix 1 reveals, demonstrating a planning of defense testimony as suggested by Scafe.

The defendant timely objected to admission of both exhibits, citing the open file agreement in the Omnibus Hearing Report and claiming surprise, and arguing that the Government had agreed to supply that information as part of the discovery that was ordered by the magistrate on a continuing basis. III R. 226, 229. The objections were overruled. The trial judge stated that the Government's duty was to provide evidence that would be used in its case in chief, but that it was not required to provide anything in the way of rebuttal or cross-examination evidence. III R. 227–28.

Defendant argues on appeal that admission of the documents violated both the agreement in the Omnibus Hearing Report and F.R.Cr.P. 16(a)(1)(A), saying they were highly prejudicial by reflecting directly on the theory of self defense. The Government responds that the documents were not provided to defense counsel because of a good faith belief that Rule 16(a)(1)(A) did not extend to statements that were not given to Government investigators or agents; that defendant knew the letters had been intercepted and that defendant had suggested no specific prejudice resulting from the Exhibits. III R. 27–28.

■ We hold that there is no valid reason for refusing disclosure of a defendant's statements, otherwise discoverable under Rule 16(a)(1)(A), on the ground that the rule applies only to evidence to be offered in the case in chief, and that the

matters in question were not or are not to be offered except as rebuttal or on cross-examination of defense witnesses. The provisions of Rule 16(a)(1)(A) are clear and unambiguous, namely that on request the Government "shall permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the government ..." The intended use of the statements, whether for direct substantive proof or for impeachment or rebuttal purposes, is not controlling; if the statements are "relevant written or recorded statements made by the defendant ..." and the other conditions of the rule are satisfied, the rule is clear that the Government shall permit inspection and copying. *United States v. Caldwell*, 543 F.2d 1333, 1352 n. 93 and 1353 (D.C.Cir.1974), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). The language of the rule reflects no intention that it be restricted to statements to be used in the Government's case in chief, and we reject that restrictive interpretation of the rule. *See United States v. Caldwell, supra; cf. United States v. Mitchell*, 613 F.2d 779, 781 (10th Cir.), *cert. denied*, 445 U.S. 919, 100 S.Ct. 1283, 63 L.Ed.2d 604 (1980); *United States v. Jensen*, 608 F.2d 1349, 1356–57 (10th Cir.1979). We are not persuaded by the contrary view expressed in *United States v. Panas*, 738 F.2d 278, 285 (8th Cir.1984). In fact, "[c]ommon sense and judicial experience teach that a defendant's prior statement in the possession of the government may be the single most crucial factor in the defendant's preparation for trial." *United States v. Percevault*, 490 F.2d 126, 129–30 (2d Cir.1974).

Moreover, our broad construction of the rule is supported by the legislative history on the amendment of the Rule. *Inter alia*, the Rule was amended in 1975 to provide that the Government "shall permit" disclosure of any relevant written or recorded statements made by the defendant on his request. Previously disclosure was ordered at the discretion of the trial judge, the rule saying that on motion the court "may order" the attorney for the Govern-

ment to permit inspection and copying. The amendment was made in order "to promote greater pretrial discovery," in the view that "broader discovery will contribute to the fair and efficient administration of criminal justice ... by minimizing the undesirable effect of surprise at the trial ..." *Notes of Committee on the Judiciary*, House Rept. No., 94–247, 94th Cong., 1st Session. 13, *reprinted in* 1975 U.S.Code Cong. & Ad.News 674, 685. *See United States v. Gallo*, 654 F.Supp. 463, 467–68 (E.D.N.Y.1987).

■ The Government's brief asserts that the exhibits were not furnished because of a good faith belief that Rule 16(a)(1)(A) did not extend to statements not given to Government investigators and which did not pertain to the occurrence of the event. Brief of Appellee 11. These points are also not persuasive, particularly in view of the Government's commitment to an "open file" policy in the case. Of course, the statements must be "relevant" under the Rule, but that broad term surely would encompass the two statements in question. The notion that they must have been made to a Government agent is untenable, in light of the language of the Rule. *See United States v. Feinberg*, 371 F.Supp. 1205, 1210–11 (N.D.Ill.), *aff'd in part, rev'd in part on other grounds*, 502 F.2d 1180, 1181 (7th Cir.1974), *cert. denied*, 420 U.S. 926, 95 S.Ct. 1122, 43 L.Ed.2d 396 (1975).

Under the Rule we therefore conclude that the failure of the Government to reveal the statements was wrong, and that the admission of them was error.[5]

■ We are convinced, however, that the error in not disclosing the statements and in admitting them over objection was harmless beyond a reasonable doubt. The defendant admitted he was aware that Government Exhibit 21 had been intercept-

ed and he assumed that the letter to his father, Exhibit 22, had also been intercepted under standard practice of the Bureau of Prisons. III R. 259, 282. The evidence otherwise properly admitted and the defendant's own testimony were most damaging. The undisputed evidence of the attack, the assault on Bryson from the rear, and the gruesome evidence of repeated stabbings was overwhelming proof of guilt. The exclusion of the two exhibits would not have had any measurable effect in improving the chances of a self-defense theory. Despite the somewhat lengthy jury deliberations, since the case against Scafe was not woven from circumstantial evidence, and the proof of his guilt was overwhelming, we conclude the error was harmless beyond a reasonable doubt and that the conviction should not be disturbed. *See Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969).

## V

No reversible error being demonstrated, we conclude that the judgment and sentence should be

AFFIRMED.

### APPENDIX 1

**Government Exhibit
21
83–30004–01**

Young George.

Hi Baby!

No, really,—thought I'd write you a kite since we never get a chance to talk for long.

Hope you can get back to the mainline soon, as at least you could get high more often. Of course I don't have any advice as to how to get out since these assholes will do what they will.

---

5. In addition, here the Government had made a firm commitment to an "open file" policy in the Omnibus Hearing Report Order. I R. 10. With such a representation made, we perceive no basis for the Government to claim that only a portion of the statements in the file were to be revealed because they were evidence in chief, but that there was a confidential part to be reserved for rebuttal or impeachment. Further-

more, the argument that there was no specific request for the documents, asserted here by the Government, is unpersuasive. While we have no record of the discussions between counsel in connection with the Omnibus Hearing, the Omnibus Hearing Report must be fairly read as reflecting discussion of such discovery and the clear commitment by the Government that its file was open in this case.

Here's how it looks on ur business. The trial is being held in front of the Chief Judge for the district, Judge O'Connor, since Judge Rogers will be on vacation then. We start picking the jury on Monday—July 8, then the govt. presents it's case which will probably take a day and ½. So, I figure you guys will be called on Wednesday the 10th.

Remember, you heard 'Bryson' threaten to kill me as we were standing by the stairs to 2nd floor Rec. at *5:30 P.M.*, right after supper as we walked back from chow, on Tuesday—March 19. My lawyer will probably ask you about your priors as the government will anyway and we can beat them to the punch. They'll have everybody's rap-sheet there so just tell the truth so they don't impeach your testimony—that is, disallow it because you lied about a prior. I know how ornery you are but thats why I like you!

Then, we will want to bring out my general good character and peacefull nature and establish how argumentative and assaultive Bryson was.

I'm taking my homeboy—Sam Mosley—off the witness list since he is going to Lompoc next week and he is an old man and sick and the bus rides would do him no good.

So the witnesses will be you, Butch, Bon, Biggs, Charley, Dog and Jeff Homer. I'm also going to call Officer Garrett since I worked for him in the Center Hall for a year. He's going to say what a nice guy I am and also what a dangerous place this is, and how threatening someone's life in here is real serious business.

I got to read most of the memos and reports when my lawyers came the other day. One Video-Camera Tape shows me coming off the stairs to the flag at 7:30:10 sec. (with a knife). Then another Video-Camera Tape shows me leaving it in his chest at 7:31:29. So, I guess we were out of range, or missed the pan of the camera for the 79 seconds it took to kill the cocksucker. I'll get to see those films sometime before the trial and also the pictures. He had 20 stab wounds, any which of 5 could have been fatal. There were two punctures of the throat. There were 5 wounds to the heart—3 of which went through the body and out the other side. (The piece's blade was 7–8″ long). Two of the penetrations to the lungs went all the way through the body. Oh, I really loved reading all that!

They have Ltnts. Gess, Williams & Sasek as witnesses plus about 6 other regular cops. Then they have 3 confidential informants who have plenty to say about how the guy had insulted me & how I attacked him & the blood was spurting & oh, it was so awful. Ha Ha.

One of them says that I bumped into Bryson on the range & then said "excuse me", then Bryson told me "don't ever touch him again & did I understand that" Ha Ha. I couldn't believe that! I'm going to try to find out who those dudes are. I doubt they will use them—or their statements—since if they want to introduce their statements, they have to bring them to court so I can see them.

Bryson was a black-male out of Wash. D.C. 42 yrs. old, 5'8″—160 lbs. in case they ask you to describe him. He distinctly resembled an old dried-up piece of dog-shit!

So—that's about it. Take it easy down there. I really do appreciate your help on this case and I want you to know that you can always count on me for help if you ever need it—whether for a court-case or for a hassle.

I know you *think* you are the boss of that cell. But if you were ever in a cell with me—I would be the Boss!

Tom
(Dad)

APPENDIX 2

Wed. June 19, 1985

Dear Dad.

Hi! Hope this finds you well, also Harriett and the rest of the family. I'm doing fine.

Guess you have the house & garage fixed up by now. We've been having real cool weather here as it gets down around

50° at night and that seems cool for this time in June.

I've had a little problem here recently and it seems to be having a real unfortunate ending. First of all, I'm allright. I'm in the segregation building and locked in my cell most of the day. Of course, I've lost my job and all. However, I'm still able to order from the commissary, have books & magazines and my radio, etc. Here is what happened:

I was getting my work-out last week on the yard and doing my exercises & all. This was on the weight-pile, the area where we lift weights, etc. Well, there was this one individual who I've seen around here for awhile who had taken a real dislike for me. He was a black out of Wash D.C. and a real avid racist and went out of his way to be disrespectful towards any whites he perceived to be meek. Well, you know, that I'm basically an introvert and keep to myself. He apparently felt that I was someone he could bully as he's a real big husky guy in his mid 40's—about 6'2", 220 lbs. He was a member of the Nation of Islam—you know, the ones who follow Louis Farrakham who was in the news as a supporter of Jesse Jackson's bid for the presidential nomination. Anyway, this was a real hateful guy.

Well, we were working out; there was a group of guys there—about 30 or 40— which is usual. I mean it was just a regular scene, there—everybody working out. Then, this guy starts insulting me and this & that and some words were said and he attacked me with a pipe. Well, I was able to defend myself and fought back and we were hassling and fighting and he went down and now he is in the hospital and in a coma. So, basically, what happened is that; and they are not sure if he's going to live and here I am in the 'hole', really.

Now, one thing for sure is going to happen. Well, two things, really. One, is that I'll be transfered to the prison in Marion, Ill. probably within 2 or 3 months. Two, is that I'll be charged with something downtown and wind up getting some more time. Now, I am charged with assault and attempted murder as far as disciplinary proceedings here at the institution. The F.B.I., who prosecutes this type of thing has not charged me yet in court, but, unless the guy dies, it will probably be attempted murder. If he dies, then its murder.

Of course, it seems pretty bad now but it was a clear-cut case of self-defense and there were numerous witnesses to that fact and I had several injuries myself. So, we will just have to wait and see. As it stands now, here I am and I have no job and all and no money. I'm sorry this happened, but the guy attacked me and was trying to kill me—and all I really did was defend myself and he happened to fall on his head.

But I'm out of commission for awhile. I'm not sure what's going to happen but the way the authorities look at it now is that *I* tried to kill this guy which is all wrong but we will have to go to court and all.

Then, there is always an undercurrent of racial conflict and the potential for more violence and they have a standard policy of doing things. The prison at Marion is on all lock-up disciplinary unit for the whole system.

Anyway, I'll probably be here yet for awhile and I hope this guy doesn't die and I don't get that charge on me. But—please don't worry about it. I'm allright. I was only defending myself as this individual attacked me with an iron pipe. There was nothing else I could have done.

Well, untill I see what happens, I want to ask you for a few dollars more per month for a little while. As I lost my job, that took a big bite out of my finances. I was hoping we could make it $50/month for awhile—but if that is too much, please send me $40. So—you decide. Whatever you send I'll be grateful; send a U.S. Postal Money Order for whatever you think is right.

Needless to say, my parole date has been rescinded and I'll not be getting out then. Whatever happens at the institutional level, they will have me rescheduled for another parole hearing after the resolution of all charges. As far as any new charges in

district court = Invol. Mnsltr.—3 yrs, Vol. Mnsltr.—10 yrs, 2nd Degree—any number of years, 1st Degree—automatic Life sentence, or Assault/Attempted Murder—10 yrs and up.

But it's really too early to think of all that. But it is something to consider. In light of all that, though, I could be dead. So—thats the way I look at it.

I hope you can understand this, Dad. I know its an unfortunate thing to have happen. But thats the way it goes, sometimes.

Please send me a U.S.P.M.O. for $50 if you can—or what you can.

Write soon!

Love, Tom