**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Owen Kelly BRANTLEY,**
**Defendant–Appellant.**

**No. 92–7059.**

United States Court of Appeals,
Tenth Circuit.

Feb. 17, 1993.

Dennis A. Fries, Asst. U.S. Atty. (John Raley, U.S. Atty., with him on the brief), Muskogee, OK, for plaintiff-appellee.

Paul D. Hoover of Kusin & Hoover, Texarkana, TX, for defendant-appellant.

Before ANDERSON and EBEL, Circuit Judges, and McWILLIAMS, Senior Circuit Judge.

McWILLIAMS, Senior Circuit Judge.

In an 8–count indictment filed in the United States District Court for the Eastern District of Oklahoma, Owen K. Brantley, the appellant, and his co-defendants, Jimmy Carroll Hamlin and Heather Elizabeth Calvin, were charged with various drug related offenses.

In count 1, all three defendants were charged with conspiring to commit described drug offenses against the United States, in violation of 21 U.S.C. § 846.

In count 2, all three defendants were charged with conspiring to use two firearms, namely a loaded Coonan Arms .357 caliber semi-automatic pistol and a loaded Charter Arms .357 caliber revolver, during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 371.

In count 3, all three defendants were charged with knowingly possessing a listed precursor chemical, namely phenylacetic acid, knowing that the precursor chemical would be used to manufacture amphetamine or methamphetamine, in violation of 21 U.S.C. § 841(d)(2) and 18 U.S.C. § 2.

In count 4, all three defendants were charged with knowingly possessing phenylacetic acid with an intent to manufacture amphetamine or methamphetamine,

in violation of 21 U.S.C. § 841(d)(1) and 18 U.S.C. § 2.

In count 5, Brantley and Calvin were charged with knowingly using a telephone in causing or facilitating the commission of a drug offense, in violation of 21 U.S.C. § 843(b) and 18 U.S.C. § 2.

In count 6, all three defendants were charged with knowingly attempting to manufacture 70 pounds of amphetamine or methamphetamine, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2.

In count 7, all three defendants were charged with knowingly carrying a loaded Coonan Arms .357 caliber semi-automatic pistol and a loaded Charter Arms .357 caliber revolver during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1) and (2) and 18 U.S.C. § 2.

In count 8, Hamlin was charged with the possession of a Coonan Arms .357 semi-automatic pistol after having been previously convicted of a felony, in violation of 18 U.S.C. § 922(g)(1).

A jury convicted Brantley on counts 1, 3 and 5, and acquitted him on counts 2, 4, 6 and 7. Brantley was sentenced to 120 months imprisonment on counts 1 and 3, these sentences to be served concurrently. He was also sentenced to 6 months imprisonment on count 5, to be served consecutively to the other sentences.

Brantley appeals his various convictions and the sentences imposed thereon, and urges three grounds for reversal: (1) error by the district court in refusing to disclose the identity of a confidential informant and permit inquiry into the relationship between the confidential informant and the District 17 Task Force of McCurtain County, Oklahoma; (2) error by the district court in denying Brantley's motion to sever his trial from Hamlin's trial; and (3) error in the district court's upward adjustment of Brantley's base offense level by two separate two-level enhancements. Finding no error, we affirm.

The evidence introduced at trial of this case indicated that this was a so-called "reverse buy" drug operation wherein Joe Cantrell, an agent of the Oklahoma Bureau of Narcotics and Dangerous Drugs, "sold" phenylacetic acid to the three defendants. This investigation started when Joe Cantrell received information that an informant working for the District 17 Task Force of McCurtain County, Oklahoma, had indicated that Brantley and Calvin were interested in purchasing phenylacetic acid.

Agent Cantrell, to be known to the defendants as "Tom," initiated a telephone call to Brantley at Calvin's home on October 16, 1991. At that time, arrangements were made for a meeting to discuss a purchase of the acid. There were other phone calls between Cantrell, Brantley and Calvin wherein the latter two sought to purchase small amounts of the acid, although they later informed Cantrell that they had another source for a purchase. On November 22, 1991, Brantley and Calvin attempted to meet with Cantrell at the Antlers' McDonalds and to discuss the possible purchase of 110 pounds of the acid for $15,000. This meeting did not occur because Brantley and Calvin were late.

After additional phone calls, they arranged another meeting on December 6, 1991, at the Fina Truck Stop in Savanna, Oklahoma. During one phone conversation on December 6, 1991, Brantley informed Cantrell that he would be bringing another individual named "Jim," later identified as Hamlin, who "knew more" about the acid than did he or Calvin. In another telephone conversation that same day, Brantley described "Jim" as the "cook." During that same conversation, Brantley informed Cantrell that he was $1,500 "short," and the two of them agreed that any shortage would be paid with a part of the methamphetamine produced from the acid.

On December 6, 1991, Cantrell met with all three defendants at the Fina Truck Stop in Savanna, Oklahoma. Brantley gave Cantrell $13,000 for the phenylacetic acid which Cantrell had acquired from the Drug Enforcement Agency's district office in Dallas, Texas. The acid was in a closed barrel. Hamlin identified himself as "Jim" and wanted to inspect the acid. After simply viewing the barrel, Hamlin said he didn't need to open the barrel, since it

smelled "good." Brantley and Hamlin, assisted by Cantrell, then took the barrel from Cantrell's vehicle and placed it in the trunk of Calvin's car. Discussion ensued concerning the possible future purchase of other precursor chemicals. On a prearranged signal, the authorities moved in and arrests were made.

The three defendants were driven to the scene by Calvin, with Brantley sitting on the passenger side of the front seat and with Hamlin seated in the rear seat. A search of the vehicle disclosed a loaded Coonan Arms .357 semi-automatic pistol laying on the floor of the back seat and a second weapon, a loaded Charter Arms .357 calibre revolver, inside a holster and laying on the floor on the passenger's side in the front seat.

Testimony of defense witnesses indicated that Charlie Ostrodock, who was then in state prison, asked his friend, Calvin, to purchase the acid, and that Calvin, in turn, asked Brantley to assist her in the purchase. It would appear that at some point in time Ostrodock informed the District 17 Task Force of McCurtain County, Oklahoma of his conversation with Calvin. The Task Force, in turn, advised Joe Cantrell, who then initiated his contact with Brantley and Calvin.

As indicated, Brantley's initial ground for reversal is that the district court erred in refusing to allow inquiry into the relationship between the confidential informant, Charlie Ostrodock, and Task Force 17. Apparently, at some point in time, either before trial or during trial, defense counsel knew the identity of the informant. But, as indicated, at trial defense counsel sought, unsuccessfully, to show that in exchange for his information concerning his conversation with Calvin, Ostrodock had been promised "leniency" by Task Force representatives.

We are convinced that defense counsel knew the identity of the informant, Ostrodock, in advance of trial. Certainly Calvin did, and she testified that she advised Brantley that she was going to purchase the acid at the behest of Ostrodock. Such being the case, the real thrust of Brantley's

argument is that he was precluded from developing the relationship between Task Force 17 and Ostrodock and showing, if he could, that in return for Ostrodock's information that Calvin and Brantley were in the market for acid, Ostrodock was promised some form of leniency.

■ We have recognized that the public's interest in effective law enforcement permits law enforcement personnel to withhold the name of a confidential informant so long as such does not impinge on a defendant's right to a fair trial. In the instant case, it is Brantley's belief that evidence of promises made to Ostrodock would have had some bearing on his defense of entrapment.

■ It is certain, however, that Ostrodock was not involved in any of the numerous telephone conversations between Cantrell and Brantley, or Calvin, and further that Ostrodock was not present on December 6, 1991, at the Fina Truck Stop when Brantley gave Cantrell $13,000 in exchange for the barrel of acid. Such being the case, we believe *United States v. Mendoza–Salgado*, 964 F.2d 993 (10th Cir.1992) is virtually dispositive of this point.

In *Mendoza–Salgado*, we spoke as follows:

Defendant Mendoza asserts the district court deprived him of due process and a fair trial by denying his motion to disclose the identity of the DEA's confidential informer. Mr. Mendoza claims the informer was essential to his entrapment defense because he was the only individual capable of testifying as to whether or not defendant was predisposed to commit the offense. We find no constitutional error.

Due to the strong public interest in furthering effective law enforcement, the government enjoys a privilege to withhold from disclosure the identity of persons who furnish law enforcement officers with information on criminal acts. *Rovario v. United States*, 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957). While anonymity encourages citizens to communicate their knowledge of unlawful activity, the privilege must give way to fairness when disclosure of the

informer's identity "is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Id.* at 60–61, 77 S.Ct. at 628. The need for disclosure depends on the "particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* at 62, 77 S.Ct. at 629. *In short, the problem "calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." Id.*

We have applied the legal standard established in *Roviaro* on numerous occasions. While we agree the district court must disclose the informer's identity if the individual's testimony "might be relevant to the defendant's case and justice would best be served by disclosure," *United States v. Reardon,* 787 F.2d 512, 517 (10th Cir.1986), *we have consistently ruled that where the information sought "would be merely cumulative," or where the informer did not participate in the illegal transaction, disclosure is not required. United States v. Scafe,* 822 F.2d 928, 933 (10th Cir.1987). *See United States v. Freeman,* 816 F.2d 558, 562 (10th Cir.1987); *Reardon,* 787 F.2d at 517. "[M]ere speculation about the usefulness of an informant's testimony" is not sufficient to warrant disclosure. *Scafe,* 822 F.2d at 933. Nor must the government supply the defendant with information about an informer when the individual introduces suspected traffickers to narcotics agents. *United States v. Ortiz,* 804 F.2d 1161, 1166 (10th Cir.1986).

*Id.* at 1000–01 (emphasis added).

Where, as here, the informant was not a participant or witness to the crime, this court has consistently held that the identity need not be disclosed. *See, e.g., United States v. Moralez,* 917 F.2d 18, 19 (10th Cir.1990); *Scafe,* 822 F.2d at 933; *Freeman,* 816 F.2d at 562; *Reardon,* 787 F.2d at 517; *United States v. Halbert,* 668 F.2d 489, 496 (10th Cir.), *cert. denied,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 453 (1982); *United States v. Perez–Gomez,* 638 F.2d 215, 218 (10th Cir.1981); *Garcia v. United States,* 373 F.2d 806, 808 (10th Cir.1967). Thus, in the instant case, the district court did not abuse its discretion by refusing to require the government to disclose, prior to trial, the identity of Ostrodock, and it follows that the district court did not abuse its discretion at trial when it refused to permit defense counsel to inquire into the relationship between Ostrodock and Task Force 17.

■ Brantley's second ground for reversal is that the district court erred in denying his motion to sever his trial from Hamlin's.[1] It is argued that Brantley's defense was "antagonistic" to Hamlin's, and therefore a severance should have been granted. As indicated, Brantley's defense was entrapment, and Hamlin's defense, though he didn't testify, was that he was just "along for the ride." We fail to see how Brantley's defense and Hamlin's defense are inconsistent, let alone antagonistic. In this regard, counsel recognizes the general rule that "defendants indicted together may be tried together." A motion for a severance in a criminal trial is a matter resting within the sound discretion of the district court, and we find no abuse of that discretion here. *United States v. Parrish,* 925 F.2d 1293, 1299 (10th Cir. 1991) (citing *United States v. Eaton,* 485 F.2d 102, 106 (10th Cir.1973)).[2]

Brantley's final argument is that the district court erred in making two separate

---

1. Calvin, as a result of a plea bargain, plead guilty to count 7 and was not tried with Brantley and Hamlin.

2. In the recent case of *Zafiro v. United States,* — U.S. ——, —— – ——, 113 S.Ct. 933, 937–938, 122 L.Ed.2d 317 (1993), the Supreme Court held that Fed.R.Crim.P. 14 does not require a severance as a matter of law where co-defendants present mutually exclusive defenses. As indicated, in the instant case, the defenses of Brantley and Hamlin, in our view, were neither inconsistent or antagonistic, let alone mutually exclusive. *Id.* at ——, 113 S.Ct. at 939 (Stevens, J. concurring) (noting that the jury could have accepted a co-defendant's defense "in toto without precluding acquittal" of the defendant).

**384**

two-level upward adjustments of his base offense level. The district court set Brantley's base offense level at 28, and counsel in his brief states he has no "quarrel" with that determination. The district court, however, increased the base offense level by two levels, finding that Brantley was a leader or supervisor in the purchase. Sentencing Guidelines, § 3B1.1(c) permits an upward adjustment of a base offense level by two levels if the defendant "is an organizer, leader, manager or supervisor" in the criminal activity.

■ The record does, in our view, support a finding that Brantley was a leader or supervisor in the acid purchase. The starting point for the acid purchase was admittedly Calvin's conversation with Ostrodock in the state prison. But thereafter, Brantley, in effect, "took over," having numerous telephone conversations with Joe Cantrell, arranging the purchase, giving $13,000 to Cantrell at the scene of the transaction, recruiting Hamlin and then assisting in transferring the barrel of acid from Cantrell's vehicle to the trunk of Calvin's car.

■ The district court also increased Brantley's base offense level by an additional two levels for carrying firearms in the course of the drug transaction. United States Sentencing Guidelines, § 2D1.1(b)(1). As concerns the weapon which Hamlin admittedly brought with him, counsel recognizes that under *United States v. McFarlane,* 933 F.2d 898, 899 (10th Cir.1991) (citing Sentencing Guidelines, § 1B1.3(a)(1) and comment note 1), the Sentencing Guidelines permit upward adjustment for the conduct of others. And, of course, in the instant case, a second weapon was found on the floor of the passenger's side of the front seat, literally at Brantley's feet.

Judgment affirmed.