FILED
**United States Court of Appeals
Tenth Circuit**

**November 4, 2025**

**Christopher M. Wolpert
Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ISAAC NEWMAN SOCKEY,

    Defendant - Appellant.

No. 24-7063

_____

**Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. 6:23-CR-00169-RAW-1)**
_____

Stuart W. Southerland, Assistant Federal Public Defender (Scott A. Graham, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Muskogee, Oklahoma, for Defendant-Appellant.

Benjamin D. Traster, Assistant United States Attorney (Christopher J. Wilson, United States Attorney, with him on the brief), Muskogee, Oklahoma, for Plaintiff-Appellee
_____

Before **MORITZ**, **KELLY**, and **ROSSMAN**, Circuit Judges.
_____

**KELLY**, Circuit Judge.
_____

    Defendant-Appellant Isaac Sockey was convicted by a jury of first-degree murder in Indian Country, 18 U.S.C. §§ 1111(a), 1151, & 1153, and sentenced to life imprisonment. I R. 74, 126–32. Over the government's objection, the district court

instructed the jury on the lesser-included offense of voluntary manslaughter. Over Mr. Sockey's objection, the district court also instructed that "words alone" cannot "negate malice aforethought and create heat of passion." I R. 107. On appeal, Mr. Sockey challenges the "words alone" instruction as legally incorrect and having an improper effect on the jury. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## Background

Mr. Sockey, a member of the Choctaw Nation, lived in a home in Tahlequah, Oklahoma with his relatives Aaron Bolin, Rodney Bolin, Renita Tubby, and Thurdis Tubby. III R. 47, 49, 110. Over the years that they lived together, Mr. Tubby was "mean" to Mr. Sockey and would pick on him "[a]lmost every day." Id. at 102–03, 171–75.

On September 8, 2023, Mr. Sockey and his male roommates spent the evening at home drinking beer. Id. at 52–53. The group "trash talk[ed]" one another while drinking together at the kitchen table. Id. at 54–56. "[N]ickname calling" and "picking on each other" were typical among the group. Id. at 55–56, 182. On that night, Mr. Sockey and Rodney Bolin also played chess until Mr. Sockey became too intoxicated to continue. Id. at 52, 88.

At some point during the evening, Mr. Sockey went to Ms. Tubby's room to complain about how the others teased him. Id. at 176–77. Mr. Sockey was "[a]ngry, upset, [and] mad" over the teasing. Id. at 176. Ms. Tubby, who had heard the others call Mr. Sockey a "crybaby," offered to drive him to a friend's house if he could

2

"hang in there until tomorrow." Id. at 177–78. Mr. Sockey agreed that he would "try" to do so and left her room. Id. at 178.

Mr. Sockey told the others that he was "tapping . . . out" and going to sleep. Id. at 57. But before he retired to his room for the evening, Aaron Bolin made fun of Mr. Sockey's "scrawny" legs and called him "chicken legs" and a "crybaby." Id. at 56–57, 81. Mr. Sockey laughed as he went to his room and closed the door behind him. Id. at 57. The rest of the men remained in the kitchen and, after Aaron Bolin asked Mr. Tubby how to say "chicken legs" in Choctaw, Aaron Bolin and Mr. Tubby began calling Mr. Sockey "chicken legs" in Choctaw. Id. at 57–58. However, Mr. Tubby "started . . . making more of it" and added additional words in Choctaw that the others could not understand. Id. at 57, 92. Aaron Bolin and Mr. Tubby then turned to a different topic of conversation. Id. at 58.

After about five or ten minutes, Mr. Sockey came out of his room with a knife in hand. Id. at 59, 79. He held the knife to Mr. Tubby's neck and told him to "keep talking crap, keep[] talking trash" and to "say it again." Id. at 59, 61. Mr. Tubby grabbed Mr. Sockey's knife-holding hand and a struggle followed. Id. at 59. The two men stumbled into Ms. Tubby's bedroom door, at which point Ms. Tubby opened the door from the inside, and the two men fell to the ground. Id. Mr. Tubby ended up on top of Mr. Sockey and Mr. Sockey reached around with the knife and stabbed Mr. Tubby several times in the back of his head, neck, and shoulder. Id. at 59, 62, 157–58.

3

After the stabbing, Ms. Tubby and Mr. Sockey called 9-1-1 and Aaron Bolin ran next door to call for an ambulance. Id. at 62, 81, 192. Mr. Sockey told the 9-1-1 operator that he "killed a man" and that he was "sorry" and he "didn't mean to do it, but [Mr. Tubby] kept on talking shit, and [he] stabbed him in the neck and the heart, everywhere that [he] could." See 9-1-1 call. By the time the officers arrived, Mr. Tubby was unresponsive. III R. 118. Paramedics took Mr. Tubby to a hospital where he was pronounced dead. II R. 7.

Murder is defined as the "unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a). During trial, Mr. Sockey did not contest that he stabbed and killed Mr. Tubby. Instead, his defense was that he acted out of heat of passion, reducing his culpability to voluntary manslaughter. III R. 252–53. Voluntary manslaughter is defined as "the unlawful killing of a human being without malice," which can include such killing "[u]pon a sudden quarrel or heat of passion." 18 U.S.C. § 1112(a).

Mr. Sockey did not propose any jury instructions. III R. 204. Instead, the district court provided the parties with proposed jury instructions, including an instruction on voluntary manslaughter and heat of passion. Id. at 200–02. The government requested an additional instruction concerning "words alone" which the district court modified and used:

> Words alone, no matter how aggravating or insulting, do not negate malice aforethought and create heat of passion. This is because words alone do not provoke such a passion, fear or rage that causes an ordinary person to lose his normal self-control. Thus, no mere words are sufficient to reduce a homicide from murder to manslaughter.

4

I R. 107; III R. 202–04, 214.

Mr. Sockey now appeals from his conviction.  He contends that the district court erred when it instructed the jury that "words alone" cannot provoke a killing in the heat of passion and thus cannot mitigate his conviction to voluntary manslaughter.  Aplt. Br. at 9–10.

**Discussion**

"We review the jury instructions de novo and view them in the context of the entire trial to determine if they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case."  United States v. Woodmore, 127 F.4th 193, 209 (10th Cir. 2025) (quoting United States v. Freeman, 70 F.4th 1265, 1278 (10th Cir. 2023)).  And we review individual instructions or the decision to give or refuse to give a particular instruction for abuse of discretion.  Id.  Further, district courts have "substantial latitude and discretion in tailoring and formulating" jury instructions.  Id. at 210 (quoting United States v. Wood, 207 F.3d 1222, 1235 (10th Cir. 2000)).  Instructions need not be perfect.  Rather, "[w]e will reverse only in those cases where [we have] a substantial doubt whether the jury was fairly guided in its deliberations."  Jensen v. W. Jordan City, 968 F.3d 1187, 1197 (10th Cir. 2020) (second alteration in original) (quoting United States v. Sorensen, 801 F.3d 1217, 1236 (10th Cir. 2015)).  Finally, "instructional errors are subject to harmless error review."  Woodmore, 127 F.4th at 210 (quoting United States v. Benvie, 18 F.4th 665, 670 (10th Cir. 2021)).

"Heat of passion" is defined as "a passion of fear or rage in which the defendant loses his normal self-control as a result of circumstances that would provoke such a passion in an ordinary person, but which did not justify the use of deadly force." United States v. Serawop, 410 F.3d 656, 664–65 (10th Cir. 2005) (quoting United States v. Browner, 889 F.2d 549, 552 (5th Cir. 1989)); see also Tenth Cir. Pattern Crim. Jury Instr. 2.54. Heat of passion is a "mitigating factor" which negates malice aforethought such that a defendant who kills in the heat of passion is guilty of voluntary manslaughter, not murder. Serawop, 410 F.3d at 665; United States v. Currie, 911 F.3d 1047, 1054 (10th Cir. 2018). Heat of passion has an objective and subjective component: the defendant must have subjectively acted in the heat of passion and the provocation must have been substantial enough to cause a reasonable person to have that passion. Currie, 911 F.3d at 1054–55.

As noted, Mr. Sockey contends that the district court erred in instructing the jury that "words alone" cannot negate malice aforethought. Aplt. Br. at 10. But before considering the instruction, we address a point about what the "words alone" instruction did not do. Mr. Sockey describes the instruction as an "absolute and total exclusion of all words . . . from supporting heat of passion." Id. at 12. He further claims that the instruction prohibited the jury from considering whether his statements to the 9-1-1 operator showed that he lacked malice aforethought. Id. at 13. These characterizations are simply incorrect. The instruction limited the basis on which the jury could find adequate provocation — meaning words by themselves, no matter how aggravating or insulting, are insufficient to provoke heat of passion

6

manslaughter.  The instruction did not prohibit the jury from considering words in general including Mr. Sockey's 9-1-1 call.

Mr. Sockey otherwise challenges the "words alone" instruction on two main grounds.  First, he contends that the instruction lacked legal support.  Second, he argues that the instruction had an improper effect on the jury.  We address these arguments in turn.

### A.  Legal Support for Heat of Passion

Beginning with the legal support, Mr. Sockey contends that there is no support for the "words alone" instruction in Tenth Circuit case law, the manslaughter statute, or the Tenth Circuit Pattern Jury Instructions.  This court has never explicitly held that words alone cannot provoke heat of passion manslaughter under 18 U.S.C. § 1112(a) and such language is not included in the pattern jury instructions.  Of course, the pattern instructions do not have adjudicative approval so it would be even more unusual if the lack of a pattern instruction somehow created such support.  See Tenth Cir. Pattern Crim. Jury Instr., Jud. Council of the Tenth Cir. Resol. (2005).

And in Allen v. United States, 164 U.S. 492 (1896), the Supreme Court considered a manslaughter instruction which stated that provocation by "mere words alone" is not sufficient "to reduce the grade of the crime from murder to manslaughter[.]"  Id. at 496–97.  Rather the victim must have been "doing some act" which "would so inflame the mind of the party who does the killing as that the law contemplates he does not act deliberately, but his mind is in a state of passion, in a heat of passion, where he is incapable of deliberating."  Id. at 497.  The Court found

7

no error in the instruction, stating that it is a "well settled" principle that "mere words, however aggravating, are not sufficient to reduce the crime from murder to manslaughter." Id. at 497. The district court's instruction reflected this principle.

Mr. Sockey maintains that Allen interpreted the common law definition of heat of passion, not the statutory definition (which lacks such a limitation), and that there is no federal common law. Aplt. Br. at 16–17. To be sure, we generally derive the elements of federal crimes from statutes rather than common law. Liparota v. United States, 471 U.S. 419, 424 (1985). But we may look to the common law to help define terms of art in criminal statutes. See Serawop, 410 F.3d at 662; see also Morissette v. United States, 342 U.S. 246, 263 (1952) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached."). Section 1112(a) does not define heat of passion. But we have recognized that sections 1111 & 1112 "adopt[ed] the language of the traditional common-law offenses of murder and manslaughter," including the common law definition for "heat of passion." See Serawop, 410 F.3d at 662, 664–65 (quoting Browner, 889 F.2d at 551).

Mr. Sockey further criticizes Allen as a "product of its time" that has been replaced by modern heat of passion law.[1] Aplt. Br. at 19–21. Although the Supreme Court decided Allen in 1896, our sibling courts have uniformly, and more recently, held that words alone are insufficient for adequate provocation. See, e.g., United

---

[1] In arguing that Allen is "a product of its time" Mr. Sockey points to the racial overtones and imposition of the death sentence on a juvenile. Aplt. Br. at 19–20.

States v. Slager, 912 F.3d 224, 236 (4th Cir. 2019) ("'[M]ere words' generally provide inadequate provocation to negate a finding of malice." (alteration in original) (quoting Allen, 164 U.S. at 497)); United States v. Burns, No. 18-10083, 2023 WL 7876414, at *1 (9th Cir. Nov. 16, 2023), cert. denied, 144 S. Ct. 1081 (2024) (stating that "words, on their own, generally do not make for adequate provocation" and finding that the at-issue insult "would not arouse a reasonable person to kill"); United States v. Velazquez, 246 F.3d 204, 213 (2d Cir. 2001) ("[T]he prevailing view has been that words can engender heat of passion only if the words impart information of a highly provocative nature."); United States v. McRae, 593 F.2d 700, 705 (5th Cir. 1979) (describing a quarrel provoked by "mere words" as one with "inadequate provocation"); United States v. Alexander, 471 F.2d 923, 946 (D.C. Cir. 1972) ("Mere words standing alone, no matter how insulting, no matter how offensive, no matter how abusive, are not adequate to acquit the defendant of second degree murder."). And although we have not considered the "words alone" issue directly, in United States v. Scafe, 822 F.2d 928 (10th Cir. 1987), we upheld a refusal to instruct on voluntary manslaughter where the victim had made derogatory statements towards the defendant and even threats against the defendant's life. Id. at 932–33. Given the federal authority and the variations in state law concerning this defense, we do not think it necessary to rely upon the state law cited by either party.

Mr. Sockey accurately identifies a nuance in the "words alone" doctrine. There may be some situations in which words alone can be sufficient to negate malice aforethought — for example, "a reasonable man may be provoked upon

9

suddenly being told of his wife's infidelity." Aplt. Br. at 12 (quoting Wayne R. LaFave, <u>Substantive Criminal Law</u> § 15.2(b)(5) (3d ed. 2025)). This statement captures a modern development in heat of passion law, which is that although mere "insults" or "abusive" words are never sufficient on their own to provoke heat of passion, words that convey information of an actual fact or injury may be sufficient. LaFave, <u>supra</u>, at § 15.2(b)(6). But nothing in this case suggests words conveying an actual fact or injury. And of course, Mr. Sockey did not request an instruction with this distinction, or for that matter, propose any instructions of his own. We agree with the government that name-calling has never been enough to justify a reasonable person losing self-control thereby permitting a heat of passion defense. Aplee. Br. at 16.

B.  <u>Effect of the "Words Alone" Instruction</u>

Moving to his second argument, Mr. Sockey contests the effect of the "words alone" instruction. He argues that Mr. Tubby's teasing words that night were the last straw of bullying, and the jury was unable to consider this theory of defense. He maintains that the "words alone" instruction foreclosed the jury's consideration of all the evidence, including the evidence tending to show subjective provocation. We disagree. To be sure, a heat of passion defense requires both subjective and objective provocation. <u>Currie</u>, 911 F.3d at 1054–55. But the court's instruction did not prohibit the jury from considering the subjective element. Rather, the instruction only clarified that, as a matter of law, words alone cannot satisfy the objective element.

Mr. Sockey similarly contends that the "words alone" instruction had the effect of "endors[ing]" the government's position. Aplt. Br. at 30–33. He claims that the instruction communicated to the jury that the evidence was insufficient to support voluntary manslaughter as a matter of law. Id. at 30; Aplt. Reply Br. at 14. He reminds us that the government quoted from the "words alone" instruction during closing arguments. Aplt. Br. at 30; Aplt. Reply Br. at 19–20; III R. 240. We find these arguments unconvincing. The district court did nothing to "endorse" the government's position. The government's emphasis on the instruction makes no difference on whether the instruction was correct.[2] Thus, Mr. Sockey has not persuaded us that any other rationales cut against the "words alone" instruction.

AFFIRMED.

---

[2] Mr. Sockey also argues that the rule of lenity weighs against including a "words alone" instruction. Aplt. Reply Br. at 9–10. However, he does not raise this argument until his reply brief and thus has waived it. United States v. Leffler, 942 F.3d 1192, 1197–98 (10th Cir. 2019).