**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 6, 2005**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

REDD ROCK SERAWOP, a/k/a
Reddrock Serawop, a/k/a Redrock
Serawop,

    Defendant-Appellant.

No. 04-4082

---

**Appeal from the United States District Court**
**for the District of Utah, Central Division**
**(D.C. No. 2:03-CR-00339 PGC)**

---

G. Fred Metos, Salt Lake City, UT, for Defendant-Appellant.

Diana Hagen, Assistant United States Attorney (Paul M. Warner, United States
Attorney, with her on the brief), Salt Lake City, UT, for Plaintiff-Appellee.

---

Before **TACHA**, Chief Circuit Judge, **McKAY**, Senior Circuit Judge, and **EBEL**,
Circuit Judge.

---

**EBEL**, Circuit Judge.

---

This appeal requires us to decide what mental state is required to convict a defendant of voluntary manslaughter under 18 U.S.C. § 1112 and to determine how district courts must instruct juries regarding that mental element. We hold that, in order to convict a defendant of voluntary manslaughter under 18 U.S.C. § 1112, the Government must prove beyond a reasonable doubt that the defendant acted in the heat of passion with either (1) a general intent to kill, meaning that the defendant was aware that the result was practically certain to follow from his conduct regardless of his desire as to that result; (2) intent to do serious bodily injury; or (3) depraved heart recklessness. Instructing the jury that voluntary manslaughter requires only an unlawful killing "in the heat of passion" is insufficient to convey this mental state requirement. Instead, juries must be specifically instructed that voluntary manslaughter requires the above-stated intentional or reckless mental state in addition to the homicidal act occurring in the heat of passion.

In this case, Defendant-Appellant Redd Rock Serawop ("Serawop" or "Defendant") was indicted for second degree murder under 18 U.S.C. § 1111(a) (2000) following the death of his three-month-old daughter, Beyonce, in Indian Country. The trial court instructed the jury on this charged offense and also on the lesser-included offenses of voluntary and involuntary manslaughter under 18 U.S.C. § 1112(a). The jury convicted Serawop of voluntary manslaughter.

Below, and on appeal, Serawop argues that jury instructions failed to charge the jury with the proper mental state required for voluntary manslaughter and thereby prevented the jury from considering whether he should instead have been convicted of the less serious offense of involuntary manslaughter.

With respect to voluntary manslaughter, the district court instructed the jury:

> If you find the defendant is not guilty of murder in the second degree, then you should proceed to determine whether the defendant is guilty of voluntary manslaughter.
> Voluntary manslaughter is the unlawful killing of a human being without malice in the heat of passion.
> In order to prove the charge against the defendant of voluntary manslaughter, the government must establish beyond a reasonable doubt each of the following elements:
> First, the defendant killed Beyonce Serawop;
> Second, the defendant acted unlawfully;
> Third, the defendant did so in the heat of passion;
> Fourth, the defendant is an Indian; and
> Fifth, the crime alleged in the Indictment occurred within Indian Country.

We agree with Serawop that this instruction fails to articulate any mental state element for voluntary manslaughter other than "in the heat of passion." Therefore, the jury erroneously could have convicted Serawop of voluntary manslaughter even if they believed he had a less culpable mental state than murderous intent or recklessness. All the jury had to find to convict Serawop of voluntary manslaughter with this erroneous instruction was that Serawop acted in the heat of passion, which could include mere negligent or grossly negligent acts.

- 3 -

To prevent this error, juries must be specifically instructed that voluntary manslaughter requires either an intentional or reckless killing. One example of a proper instruction in this case would be:

> In order to prove the charge against the defendant of voluntary manslaughter, the government must establish beyond a reasonable doubt each of the following elements:
> First, the defendant killed Beyonce Serawop;
> Second, the defendant acted unlawfully;
> Third, while in a sudden quarrel or heat of passion, and therefore without malice, the defendant:
> a) intentionally killed Beyonce;
> b) intended to cause Beyonce serious bodily injury; or
> c) acted recklessly with extreme disregard for human life;
> Fourth, the defendant is an Indian; and
> Fifth, the crime alleged in the Indictment occurred within Indian Country.
>
> As used in this instruction, "intentionally killed" means either:
> (1) a specific purpose to take the life of another human being, or
> (2) a willingness to act knowing that the death of another human being is practically certain to follow from that conduct.

Serawop was not given such an instruction in this case. Therefore, exercising jurisdiction pursuant to 28 U.S.C. § 1291, we REVERSE Serawop's voluntary manslaughter conviction and REMAND for proceedings consistent with this opinion.

- 4 -

# BACKGROUND

On November 2, 2002, Ernestina Moya, left her home on the Ute Indian reservation in northeastern Utah to serve a 12-day jail sentence for providing false information to a police officer. She left her nephew and three children, including three-month-old Beyonce Serawop, at home with Beyonce's father, Redd Rock Serawop. Beyonce had been sick before Moya left, and she cried almost constantly while Moya was away. Serawop had also just started a new job at a bottling company that week.

At approximately 1:30 a.m. on November 3, 2002, Serawop called for an ambulance and reported that Beyonce was having difficulty breathing. When she arrived at the hospital, Beyonce was limp, pale, and not breathing or moving on her own. A spinal tap produced blood, indicating she had suffered a head trauma. Beyonce was life-flighted to Primary Children's Hospital in Salt Lake City, where she was pronounced dead.

The medical examiner who performed the autopsy on Beyonce found rib fractures and contusions on her face and concluded her death was caused by three skull fractures along the left side of her skull, which were consistent with a blunt force trauma. According to the medical examiner, Beyonce would have been unable to cry or eat after she sustained these injuries, as they would have immediately rendered her unconscious. The medical examiner also testified that,

because an infant's skull is relatively malleable, it would require a considerable amount of force to compress the head to the point where the skull fractures.

Serawop gave several conflicting versions of what occurred. Initially, he told emergency room doctors that when he checked on Beyonce in the night he found she had inexplicably stopped breathing. Later, Serawop said that his 17-month-old son hit Beyonce in the head with a child's cup and that one of the children may have dropped her. In subsequent FBI interviews, Serawop said he tripped over a shoe and fell with Beyonce in his arms, causing her to hit her head on the edge of the television stand, and then revised his story to assert that he accidentally dropped his daughter and that her head struck the bathroom counter as she fell.

At trial, the Government asked the jury to convict Serawop of second degree murder. The Government relied on the evidence of multiple blows to Beyonce's face, head, and body; the inconsistencies in Serawop's stories; and the medical testimony about the amount of force required to cause Beyonce's death.

In defense, Serawop did not dispute that he had caused the death of Beyonce but instead argued he was guilty of only involuntary manslaughter or, in the alternative, voluntary manslaughter. Specifically, Serawop argued that Beyonce's death was caused by a single accidental fall and that there was doubt about the amount of force, as applied to her body, necessary to cause her injuries

on impact—particularly given Serawop's size and the weight and relative strength of the infant's head and neck. Serawop also argued that the injuries to Beyonce's face and ribs were consistent with him attempting to perform CPR. Thus, he argued, he was guilty of involuntary manslaughter at most.

In the alternative, Serawop argued that if the jury found he used extreme force, then that force was used in a heat of passion arising out of the frustration, stress, and exhaustion caused by Beyonce's consistent crying and Moya's absence. If this was the case, he said, he should be convicted of voluntary manslaughter.

The district court instructed the jury on second degree murder and the lesser included offenses of voluntary and involuntary manslaughter. The jury convicted Serawop of voluntary manslaughter, and this appeal followed.

## DISCUSSION

Serawop argues that the district court improperly instructed the jury regarding voluntary manslaughter's mental state. In particular, he contends that voluntary manslaughter requires the Government to prove an intentional or reckless killing as an element of the offense[1] and that the district court committed prejudicial error by not instructing the jury to this effect in this case. We agree.

---

[1] At oral argument on appeal, the government conceded, "We agree with [Serawop's] statement of the law that there is an intent element in voluntary manslaughter that is similar to murder except that heat of passion negates the malice required for murder. That appears clear from the case law."

## I.     Mental State Required for Voluntary Manslaughter

As an initial matter, we must determine what mental state is required for the federal crime of voluntary manslaughter. "[D]etermining the mental state required for commission of a federal crime requires 'construction of the statute and . . . inference of the intent of Congress.'" Staples v. United States, 511 U.S. 600, 605 (1994) (quoting United States v. Balint, 258 U.S. 250, 253 (1922)) (ellipsis in original). Thus, determining the mental state required under the federal voluntary manslaughter statute is a question of statutory construction we review de novo. United States v. McVeigh, 153 F.3d 1166, 1193 (10th Cir. 1998).

### A.     Statutory language

Voluntary manslaughter is one offense within a hierarchy of federal homicides. Both voluntary and involuntary manslaughter are established in a single statute, which provides:

> Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:
> Voluntary—Upon a sudden quarrel or heat of passion.
> Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

18 U.S.C. § 1112(a). In contrast, the more serious murder offenses are defined as follows:

- 8 -

Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

18 U.S.C. § 1111(a).

Unlike many modern penal codes, these federal homicide statutes fail to articulate expressly which mental states are required for each of the various offenses. In the case of voluntary manslaughter, the statute requires only the "unlawful killing of a human being without malice . . . [u]pon a sudden quarrel or heat of passion." 18 U.S.C. § 1112(a). Except for this express exclusion of malice, the statute is silent as to the mental state required for conviction. Moreover, the statute fails even to define the mental element it specifically excludes—malice.

Although our case law has consistently held that the "distinguishing element" among varying degrees of federal homicide is the defendant's mental state, see, e.g., United States v. Sarracino, 340 F.3d 1148, 1162 (10th Cir. 2003), we have not yet fully articulated the precise mental state required for voluntary manslaughter. Therefore, our task is to determine, given this sparse statutory

language and its placement within the hierarchy of federal homicides, what mental state Congress intended for voluntary manslaughter.

## B.   Interpretative rules

It is certainly true that "federal crimes are defined by statute rather than by common law." United States v. Oakland Cannabis Buyers' Coop., 532 U.S. 483, 490 (2001). However, the Supreme Court has repeatedly held that statutory silence as to mental state in a federal criminal statute does not necessarily mean that Congress intended to dispense with a conventional mens rea element. Staples, 511 U.S. at 605. To the contrary, "some indication of congressional intent, express or implied, is required to dispense with mens rea as an element of the crime." Id. at 606; see United States v. United States Gypsum Co., 438 U.S. 422, 438 (1978) ("Certainly far more than the simple omission of the appropriate phrase from the statutory definition is necessary to justify dispensing with an intent requirement."); 1 Charles Alan Wright, Federal Practice and Procedure § 125, at 567-68 (3d ed. 1999) (hereinafter "Wright") ("[C]riminal intent is an element of some crimes though not mentioned in the statute."); id. at 568 n.41 (citing Morissette v. United States, 342 U.S. 246 (1952), for proposition that

"offenses . . . carried over from the common law . . . incorporate a mental element without special statutory provision.").[2]

The federal homicide statutes "simply adopt the language of the traditional common-law offenses of murder and manslaughter." United States v. Browner, 889 F.2d 549, 551 (5th Cir. 1989). Therefore, we must construe the statutes "in light of the background rules of the common law, in which the requirement of some mens rea is firmly embedded." See Staples, 511 U.S. at 605 (utilizing common law principles to determine the mental state element of a federal firearms statute). This accords with our general practice that "where a federal criminal statute uses a common-law term of established meaning without otherwise defining it, [we] give that term its common-law meaning." United States v. Gauvin, 173 F.3d 798, 802 (10th Cir.1999) (quotation omitted); see also Morissette, 342 U.S. at 263 ("And where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.").

---

[2]See also Liparota v. United States, 471 U.S. 419, 426 (1985) (observing that in United States v. Gypsum Co., 438 U.S. at 438, the Court noted that "criminal offenses requiring no mens rea have a 'generally disfavored status.'") (emphasis in original omitted).

Similarly, we have looked to the common law to express the mental state requirements of other degrees of federal homicide. See, e.g., United States v. Pearson, 203 F.3d 1243, 1271 (10th Cir. 2000) (using common law to define the mens rea of second degree murder under otherwise silent 18 U.S.C. § 1111). We will do the same here, turning to the common law to help us distill the mental state intended for voluntary manslaughter under 18 U.S.C. § 1112.

C.   Analysis

Manslaughter developed at common law as a less culpable form of homicide for which a lesser sentence seemed justified. Initially, all homicides were unlawful and punished by death, with exception only for a narrow class of homicides committed in the enforcement of justice. Mullaney v. Wilbur, 421 U.S. 684, 692 (1975). In response to this widespread use of capital punishment, ecclesiastic jurisdiction developed to reduce what would have been death to a one-year sentence, a branded thumb, and the forfeiture of all of one's goods. Id. Later, however, English rulers grew "concerned with the accretion of ecclesiastic jurisdiction at the expense of the secular" and enacted a series of statutes limiting ecclesiastic jurisdiction's benefits only to those unlawful homicides committed without malice—homicides designated as "manslaughter." Id. at 692-93.

The common law defined manslaughter as the unlawful killing of another without malice, Stevenson v. United States, 162 U.S. 313, 320 (1896), and

- 12 -

recognized two types, voluntary and involuntary manslaughter. See Mullaney, 421 U.S. at 694 n.14. The presence or absence of malice marked the boundary which separated the crimes of murder and manslaughter. Id. Today, malice still distinguishes federal murder from federal manslaughter. Compare United States v. Lofton, 776 F.2d 918, 920 (10th Cir. 1985) (articulating malice as element of both first and second degree murder), with 18 U.S.C. § 1112 (defining both voluntary and involuntary manslaughter as "without malice").

### 1. Defining murder mens rea

Serawop's basic argument is that § 1112 incorporates the common law understanding of voluntary manslaughter as a homicide that would constitute murder but for the fact that the killing was committed in the heat of passion. Therefore, we start with an overview of the mens rea element of murder.

Second degree murder is the catch-all murder offense. See 18 U.S.C. § 1111 (defining second degree murder as "[a]ny other murder" not enhanced to first degree). Our case law defines second degree murder as an unlawful killing with malice. Pearson, 203 F.3d at 1270 (interpreting 18 U.S.C. § 1111(a)). In Pearson, we defined the mental element of second degree murder as requiring either (1) general intent to kill,[3] (2) intent to do serious bodily injury, (3)

---

[3]"A person acts knowingly or with a 'general intent' if he is aware that the result is practically certain to follow from his conduct, whatever his desire may be
(continued...)

- 13 -

depraved heart recklessness;[4] or (4) a killing in the commission of a felony that is not among those specifically listed in the first degree murder statute. Id. at 1271. These mental states make up the core murder intent.

First degree murder, on the other hand, is a more serious offense that requires proof of something in addition to this basic murder intent. See Wood, 207 F.3d at 1228. While second degree murder requires only a general intent, meaning that the defendant "is aware that the result is practically certain to follow from his conduct, whatever his desire may be as to that result," Welch, 327 F.3d

---

[3](...continued)
as to that result." United States v. Welch, 327 F.3d 1081, 1096 n.13 (10th Cir. 2003).

[4]Pearson actually uses just the term "depraved heart" to refer to this mental state; however, we have also held that malice may "be established by evidence of conduct which is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that the defendant was aware of a serious risk of death or serious bodily harm." United States v. Soundingsides, 820 F.2d 1232, 1237 (10th Cir. 1987). "The concepts of 'depraved heart' and 'reckless and wanton, and a gross deviation from the reasonable standard of care' are functionally equivalent in this context." United States v. Wood, 207 F.3d 1222, 1228 (10th Cir. 2000) questioned on other grounds by United States v. Delgado-Uribe, 363 F.3d 1077, 1082 n.6 (10th Cir. 2004). Thus, we often refer to this single mental state as "depraved heart recklessness" herein.
    Reckless conduct, in the criminal context, is considered a form of intentional conduct because it "includes an element of deliberateness—a conscious acceptance of a known, serious risk." Archuleta v. McShan, 897 F.2d 495, 499 (10th Cir. 1990) (civil due process case). Negligence, on the other hand, is careless conduct that does not require one of these forms of intent (either actual intent or intent to act with a depraved heart in reckless disregard of perceived, serious risks). See id. at 499 n.8.

at 1095 n.13; accord Soundingsides, 820 F.2d at 1242, first degree murder requires additional proof of a specific intent—including premeditation, deliberation, or a killing in the commission of certain enumerated felonies. Wood, 207 F.3d at 1228; see also United States v. Bailey, 444 U.S. 394, 405 (1980).

Despite these distinct mental state requirements for these different degrees of murder, we have always said that "malice" is an element of both first and second degree murder. Lofton, 776 F.2d at 920. Although we have sometimes been less than precise in our language—suggesting in Pearson, for example, that second degree murder's malice element is satisfied simply by establishing one of the enumerated mental states—malice is actually a legal term of art. See Browner, 889 F.2d at 551.

Malice is not satisfied simply by killing with an intentional or reckless mental state; instead, malice specifically requires committing the wrongful act without justification, excuse, or mitigation. See 50 Am. Jur. 2d Homicide § 37 (1999) ("[Malice] is said to include all those states and conditions of mind which accompany a homicide committed without legal excuse or extenuation.") (emphasis added); Black's Law Dictionary 976 (8th ed. 2004) (defining "malice" as "intent, without justification or excuse, to commit a wrongful act") (emphasis added); 40 C.J.S. Homicide § 33 (1991) ("Malice has been defined as consisting

of the intentional doing of a wrongful act toward another <u>without legal justification, excuse, or mitigation</u>.") (emphasis added).  The Supreme Court has also described malice as "lack of provocation."  <u>Patterson v. New York</u>, 432 U.S. 197, 216 (1977).

Thus, when we say that a murder must be committed "with malice," we mean not just that it requires a particular murderous intent but, more to the point, that it must also be "without legal justification, excuse, or mitigation."  This is why, in <u>Lofton</u>, we held that to establish malice the prosecution must prove beyond a reasonable doubt the <u>absence</u> of heat of passion when it is an issue in the case.  <u>Lofton</u>, 776 F.2d at 920.  Heat of passion is one legal excuse pursuant to which what would otherwise constitute murder is mitigated to a less culpable offense of manslaughter—because with heat of passion, "malice" in the sense of "lack of provocation" no longer exists.[5]  <u>See</u> <u>id.</u>

### 2.    Defining voluntary manslaughter mens rea

This takes us directly to the issue at hand, determining what "without malice . . . [u]pon a sudden quarrel or heat of passion" means in the context of 18 U.S.C. § 1112(a) and what mental state is intended by this language.  The

---

[5]Other legally recognized justifications, mitigating factors, or excuses may also preclude a finding of malice but would have different consequences.  For example, if a defendant killed in self defense, that killing would also be without malice, but that conclusion would lead to different results.

- 16 -

common law recognized "heat of passion" as one mitigating factor pursuant to which an otherwise intentional or reckless killing would constitute the less serious offense of voluntary manslaughter and be, because of that mitigating circumstance, "without malice." See Mullaney, 421 U.S. at 693; see also 2 Wharton's CRIM. LAW § 155 (15th ed.) ("As a concession to human frailty, a killing [in the heat of passion], which would otherwise constitute murder, is mitigated to voluntary manslaughter.") (emphasis added); 2 Wayne R. LaFave, Substantive Criminal Law § 15.2, at 493 (2d ed. 2003) (hereinafter "LaFave") ("The usual view of voluntary manslaughter thus presupposes an intent to kill (or perhaps to do serious injury or to engage in very reckless conduct), holding that in spite of the existence of this bad intent the circumstances may reduce the homicide to manslaughter.") (emphasis added).

As the Fifth Circuit explained:

[t]he separate offense of voluntary manslaughter emerged [at common law] as an intentional killing that is nonetheless deemed to be without malice because it occurs in what the courts called "the heat of passion," a passion of fear or rage in which the defendant loses his normal self-control as a result of circumstances that would provoke such a passion in an ordinary person, but which did not justify the use of deadly force. Again, the federal statute simply declares the language of the common-law offense, and so when the defendant . . . actuated by a sudden passion of fear or rage arising from attendant circumstances that would provoke such passion in an ordinary person, kills intentionally (or with one of the other mental states that constitutes malice), the killing is nevertheless deemed to be in the absence of malice under the federal statute. The malice that would otherwise attach is negated by the fact that the intentional

- 17 -

killing occurred in the heat of passion in response to a sufficient provocation.

Browner, 889 F.2d at 552 (citations omitted).

We agree with the Fifth Circuit that this common law understanding is carried into § 1112 where "[v]oluntary manslaughter encompasses all of the elements of murder: it requires proof of the physical act of unlawfully causing the death of another, and of the mental state that would constitute malice, but for the fact that the killing was committed in adequately provoked heat of passion or provocation." Id. at 553. Thus, the only difference between second degree murder and voluntary manslaughter in the homicide hierarchy is that voluntary manslaughter is committed in the heat of passion, and the presence of this mitigating factor negates the malice that would otherwise attach given an intentional or reckless mental state.[6] See id.

---

[6]We note that this accords with the "usual view" of voluntary manslaughter that, despite the existence of this "bad" intentional or reckless mental state, heat of passion explains, or reduces, what would otherwise be murder to manslaughter. LaFave, supra, § 15.2(a), at 493. However, there is a rare minority view "expressed in an occasional case and in a few [state] manslaughter statutes, to the effect that the passion must be so great as to destroy the intent to kill, in order to accomplish the reduction of the homicide to voluntary manslaughter." Id. (footnotes omitted). Under this stringent minority view, a defendant "must show that has passion went so far as to rob him of his normal capacity to entertain murderous thoughts, rather than that it merely made him lose the normal self-control which enables him to resist any temptation to slay another person." Id. This minority view is inconsistent with the common law as we have interpreted it, and we do not think Congress intended to imply such a departure by its silence in

(continued...)

While our court has not yet reached this issue directly, our case law directly supports this understanding. We have, without much detailed discussion, consistently noted that "heat of passion" in the voluntary manslaughter context has the effect of "negating" malice. Lofton, 776 F.2d at 920 ("The heat of passion defense is directly at odds with malice . . . the defense serves to negative malice.") (quotation and citation omitted); United States v. Scafe, 822 F.2d 928, 932 (10th Cir. 1987) ("Malice is negated by heat of passion.").

Although we have used this language of negation in reference to malice, we have never suggested that heat of passion eliminates the requirement of an intentional or reckless killing implicit in the common law and in the structure of the homicide hierarchy. To the contrary, we have frequently referred to voluntary manslaughter as a general intent crime. See, e.g., Soundingsides, 820 F.2d at 1242; United States v. Hatatley, 130 F.3d 1399, 1405 (10th Cir. 1997); see also United States v. Fortier, 180 F.3d 1217, 1228 (10th Cir.1999). Thus, malice is negated in the voluntary manslaughter context only in the sense that the killing is

---

[6](...continued)
18 U.S.C. § 1112. Therefore, we read "heat of passion" under the federal statute as explaining, or actuating, an intentional or reckless killing, not overwhelming a defendant's ability to form such an intent or perceive of a grave risk.

no longer "without excuse" as it would have to be to establish malice for second degree murder.[7]

At least two other circuits have similarly construed 18 U.S.C. § 1112 as incorporating this common law understanding and requiring the mens rea of an intentional or reckless killing as an element of voluntary manslaughter.  See United States v. Paul, 37 F.3d 496, 499 (9th Cir. 1994) (striking down a jury instruction for voluntary manslaughter similar to the instruction given in the instant case that did not require the jury to find that the defendant had the mental state of intending to kill, stating "[i]f the defendant killed with the mental state required for murder (intent to kill or recklessness with extreme disregard for

---

[7]Involuntary manslaughter, on the other hand, is a homicide "without malice" because the offender's mental state is not sufficiently culpable to meet the traditional malice requirements of an intentional or reckless killing.  See United States v. Paul, 37 F.3d 496, 499 (9th Cir. 1994); see also Browner, 889 F.2d at 553.  Instead, we have consistently held that involuntary manslaughter requires only that "defendant's acts must amount to gross negligence."  Brown, 287 F.3d at 975.

This accords with the common law tradition that involuntary manslaughter developed is the least serious degree of manslaughter and, as an "offense of negligence," one of the "few exceptions" to the common law "requirement of intention."  Morissette, 342 U.S. at 251 & n.8; Mullaney, 421 U.S. at 694 n.14.  The common law also recognized involuntary manslaughter as a homicide "committed by accident in the course of perpetrating another unlawful, although not felonious, act."  Mullaney, 421 U.S. at 694 n.14.

Thus, insofar as voluntary manslaughter is concerned, malice is lacking because (although intent to kill or recklessness is required), there is a legally recognized justification or mitigation, i.e., heat of passion.  Insofar as involuntary manslaughter is concerned, malice is lacking because there is no intent to kill.

human life), but the killing occurred in the heat of passion caused by adequate provocation, then the defendant is guilty of voluntary manslaughter. The finding of heat of passion and adequate provocation negates the malice that would otherwise attach.") (emphasis added) (citations omitted); United States v. Velazquez, 246 F.3d 204, 212 (2nd Cir. 2001) (approving language that "voluntary manslaughter requires a mental state that would be malice except for heat of passion or provocation") (emphasis added).

In addition, two other circuit decisions contain language suggesting that they also agree that a voluntary manslaughter conviction under 18 U.S.C. § 1112 requires proof of the defendant's intent to cause the death of the victim. See Wakaksan v. United States, 367 F.2d 639, 645 (8th Cir. 1966) ("An essential element of [voluntary manslaughter] was to establish that the appellant intentionally caused the death of the victim."); cf. United States v. Alexander, 471 F.2d 923, 942, 944 n.54 (D.C. Cir. 1973) (interpreting District of Columbia manslaughter statute).

Therefore, taking this all together, we read the statutory language of 18 U.S.C. § 1112 in accordance with our sister circuits' interpretations and with the history of the common law. Voluntary manslaughter requires proof beyond a reasonable doubt that the defendant acted, while in the heat of passion or upon a sudden quarrel, with a mental state that would otherwise constitute second degree

murder—either a general intent to kill, intent to do serious bodily injury, or with depraved heart recklessness.

## II.    Jury instruction

Having determined the mental state required for voluntary manslaughter, we now address Serawop's argument that the jury instruction in this case constituted prejudicial error.  "We review de novo a timely challenge to a jury instruction to determine whether, considering the instructions as a whole, the jury was misled."[8]  United States v. Curtis, 344 F.3d 1057, 1068 (10th Cir. 2003), cert. denied, 540 U.S. 1157 (2004) (quotation omitted).  "We will reverse a conviction due to an erroneous instruction only if the error was prejudicial when viewed in light of the entire record."  United States v. Voss, 82 F.3d 1521, 1529 (10th Cir. 1996) (quotation omitted).  We conclude that the instruction given in this case erroneously permitted the jury to convict Serawop even if they found that he acted with a less culpable mental state than intent or depraved heart recklessness, so

[8]Serawop objected to the court's voluntary manslaughter instruction just before closing arguments, arguing that the instruction failed to require a mens rea other than "in the heat of passion."  The court ruled that Serawop had waived the objection by failing to raise the issue earlier.  However, the Federal Rules of Criminal Procedure require that "[a] party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate."  Fed. R. Crim. P. 30(d) (emphasis added).  Serawop did so in this case.  Therefore, the Government correctly concedes on appeal that Serawop's objection was timely, and we review this issue accordingly.

long as he acted in the heat of passion; therefore, we reverse and remand for a new trial.

### A. Whether there was error

With respect to the elements of voluntary manslaughter, the district court charged the jury:

> If you find the defendant is not guilty of murder in the second degree, then you should proceed to determine whether the defendant is guilty of voluntary manslaughter.
> Voluntary manslaughter is the unlawful killing of a human being without malice in the heat of passion.
> In order to prove the charge against the defendant of voluntary manslaughter, the government must establish beyond a reasonable doubt each of the following elements:
> First, the defendant killed Beyonce Serawop;
> Second, the defendant acted unlawfully;
> Third, the defendant did so in the heat of passion;
> Fourth, the defendant is an Indian; and
> Fifth, the crime alleged in the Indictment occurred within Indian Country.

This instruction does not accurately describe the mens rea required for voluntary manslaughter. Instead of requiring the jury to find that the defendant acted either intentionally or with depraved heart recklessness, but without malice (e.g., with mitigation) because the killing occurred in the heat of passion, the elements instruction only requires the jury to find that Defendant killed "in the heat of passion."

It is undisputed that failure to instruct the jury on an element of the offense is error. <u>United States v. Riggans</u>, 254 F.3d 1200, 1202 (10th Cir. 2001); <u>see also</u>

- 23 -

2A Wright, supra, § 487, at 392 ("It is grave error to submit a case to a jury without accurately defining the offense charged and its elements."); id. § 497.1, at 472-73 ("If intent is an element of the crime, whether or not it is stated as an element, it is plain error for the court to fail to charge on that element.").

Nonetheless, the Government here contends that the instructions given contain no error because:

> general intent to kill is implicit in the statutory requirement that the defendant act in the heat of passion. A finding that the defendant killed the victim in the heat of passion necessarily includes a finding that the defendant acted intentionally, albeit with sufficient provocation. Thus, intent is not a separate element of the crime, but is subsumed in the requirement that the defendant kill in the heat of passion.

Thus, the crux of the Government's argument is that the requirement of an intentional or reckless mental state is implicit in this heat of passion element.

We are obliged to consider the instructions as a whole to determine whether the jury, taking everything together, was misled. Curtis, 344 F.3d at 1068. The district court did give a lengthy instruction on "heat of passion," in which the court said in pertinent part:

> The third element the government must prove beyond a reasonable doubt is that the defendant unlawfully killed Beyonce Serawop in the heat of passion.
>      What is meant by the expression heat of passion? Heat of passion is such a passion or emotion as naturally would be aroused in the mind of an ordinary reasonable person of average disposition in the same or similar circumstances as confronted the defendant at the time the killing occurred. It is such a state of passion, or hot blood,

> or rage, anger, resentment, terror or fear as to indicate the absence of deliberate design to kill or as to cause one to act on impulse without reflection. . . .
>
> The basic inquiry is whether or not at the time of the killing, the reason and judgment of the defendant was obscured or disturbed by passion—or dethroned, to use another expression—to such an extent as would cause an ordinarily reasonable person of average disposition to act rashly and without deliberation and from passion rather than judgment.
>
> Before you may find that the defendant acted in the heat of passion, you must also find that there was adequate provocation. Here, too, the provocation or acts arousing such passion must be such as to create the same degree of passion in a reasonable person and cause such person to lose self-control. . . .

The Government's position is that, although this certainly does not use precise "intentional" or "depraved heart reckless" language, its emphasis on proving that Serawop was in a state of mind that would "indicate the absence of deliberate design to kill or as to cause one to act on impulse without reflection" or that would cause a reasonable person "to act rashly and without deliberation and from passion rather than judgment" suggests the same. We disagree.

Assuming that the instruction requires the jury to find that Serawop acted "rashly" and "from passion," or "on impulse without reflection," or without "judgment," that is insufficient to differentiate voluntary manslaughter from involuntary manslaughter. Indeed, if the act was without "judgment," and perhaps if it was "without reflection," it might only be involuntary manslaughter, and not voluntary manslaughter at all, because voluntary manslaughter requires

- 25 -

general intent to commit murder or at least the ability to perceive of serious risks. See Soundingsides, 820 F.2d at 1237, 1242; Hatatley, 130 F.3d at 1405.

Both voluntary and involuntary manslaughter could be committed in the heat of passion, on impulse, or rashly. The essential difference between these crimes is that the more serious voluntary manslaughter offense requires that the defendant had an intent to kill (or one of the surrogate core murder intents), while involuntary manslaughter may be established even though the defendant lacked such intent, and acted only negligently or even grossly negligently. Although heat of passion is the defining difference between second degree murder and voluntary manslaughter, it is not the defining difference between voluntary manslaughter and involuntary manslaughter. Both voluntary manslaughter and involuntary manslaughter could take place in the heat of passion.

The defining difference between voluntary and involuntary manslaughter is whether the defendant acted with intent to kill (as defined for second degree murder) or negligently or carelessly. By refusing to instruct the jury on this mens rea component of voluntary manslaughter, the court gave an erroneous instruction that might have resulted in Serawop being convicted of voluntary manslaughter when his conduct merited an involuntary manslaughter conviction. Under the instruction as given, the jury could have convicted Serawop of voluntary manslaughter for negligent acts, albeit under heat of passion, when instead, under

that version of events, he should have been convicted of involuntary manslaughter. Therefore, we find there was certain error in the instructions given. See Paul, 37 F.3d at 501 (finding plain error in nearly identical instruction).

## B.     Whether error was harmless

Jury instructions that omit an element of the offense are subject to harmless error analysis. Neder v. United States, 527 U.S. 1, 4 (1999). The harmless error test is "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Id. at 15 (quoting Chapman v. California, 386 U.S. 18, 24 (1967)); see also Fed. R. Crim. P. 52(a). The burden of proving the error was harmless is on the Government. United States v. Lott, 310 F.3d 1231, 1250 (10th Cir. 2002).

Here, the Government argues that if there was error it was harmless "given the overwhelming evidence supporting the jury's conviction for voluntary manslaughter."[9] Although it is true that the medical testimony, combined with the inconsistencies in Serwop's stories, present a convincing case for voluntary

---

[9]The Government also points out that the court did allow Serawop's counsel to argue to the jury the substance of his jury instruction objections at closing. However, this is not a cure-all for prejudice. The instructions stated, "It is your duty as jurors to follow the law as stated in the instructions of the Court." Moreover, our case law recognizes that "[a]rguments and evidence cannot substitute for instructions by the court." Lofton, 776 F.2d at 921.

manslaughter, we cannot conclude beyond a reasonable doubt that the jury did not erroneously base its verdict on the given instruction, nor can we conclude beyond a reasonable doubt that the jury could not have returned a verdict of involuntary manslaughter on the evidence before us. See Neder, 527 U.S. at 15.

In Neder, the Supreme Court said that an erroneous instruction is properly found to be harmless "where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." Id. at 17.

To the contrary, in this case, the only issue actually in dispute is the very subject of the instruction's error—whether Serawop's mental state warranted conviction for involuntary or voluntary manslaughter. Because the jury here was not properly charged on this basic issue, the conviction cannot stand. See id. The risks of misunderstanding are simply too significant to overlook in this case. See also Paul, 37 F.3d at 501 (reversing under plain error analysis instruction that failed to distinguish the different mental state requirements of voluntary and involuntary manslaughter).

Thus, in light of the theory of the defense's case, we are convinced that Serawop was prejudiced here. Under the instructions given, the jury was free to convict Serawop of voluntary manslaughter regardless of the culpability of his

mental state, as long as they found he was "in the heat of passion." Because of the prejudice of this improper instruction, Serawop's conviction under 18 U.S.C. § 1112 cannot stand.

## CONCLUSION

We REVERSE the judgment of the district court and REMAND the case for a new trial on voluntary and involuntary manslaughter. The jury's guilty verdict on the lesser-included offense of voluntary manslaughter constituted an "implicit acquittal on the charge of second degree murder" and so he may only be retried on these lesser offenses. See Green v. United States, 355 U.S. 184, 190-91 (1957).