COLLOTON, Circuit Judge, dissenting.
 

 The federal manslaughter statute was enacted in 1909. According to the United States Attorney, the government has never before charged a mother with manslaughter based on prenatal neglect that causes the death of a child. As the district court observed, accepting the government's view of the statute could have broad ramifications for the criminal liability of mothers based on their conduct while pregnant. Resolving this significant issue of first impression requires careful attention to the historical underpinnings of the manslaughter statute. While I do not agree with the district court's particular statutory analysis, I do conclude that Congress has not adopted a manslaughter statute that imposes criminal liability on a mother for prenatal conduct that results in the tragic death of her child. I would therefore affirm the order dismissing the indictment.
 

 Manslaughter is a crime of long lineage. In the eighteenth century, Blackstone defined it as "the unlawful killing of another, without malice, either express or implied; which may be either voluntarily, upon a sudden heat; or involuntarily, but in the commission of some unlawful act." 4 William Blackstone,
 
 Commentaries
 
 *191. Commission of an "unlawful act" included doing "an act, lawful in itself, but in an unlawful manner, and without due caution and circumspection."
 
 Id.
 
 at *192. In 1909, Congress amended the federal criminal code to include the current definition, which aligns with Blackstone's:
 

 Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:
 

 Voluntary - Upon a sudden quarrel or heat of passion.
 

 Involuntary - In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.
 

 18 U.S.C. § 1112
 
 (a).
 
 [2]
 

 "It is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses."
 
 Sekhar v. United States
 
 ,
 
 570 U.S. 729
 
 ,
 
 133 S. Ct. 2720
 
 , 2724,
 
 186 L.Ed.2d 794
 
 (2013) (internal quotation omitted). "Manslaughter" and its common-law definition are longstanding terms of art in the criminal law.
 

 [W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.
 

 Morissette v. United States
 
 ,
 
 342 U.S. 246
 
 , 263,
 
 72 S.Ct. 240
 
 ,
 
 96 L.Ed. 288
 
 (1952). We must
 
 presume
 
 that Congress intended to incorporate the common-law meaning of common-law terms that it employs, "unless the statute otherwise dictates."
 

 Neder v. United States
 
 ,
 
 527 U.S. 1
 
 , 23,
 
 119 S.Ct. 1827
 
 ,
 
 144 L.Ed.2d 35
 
 (1999) (internal quotation omitted). In discerning the meaning of § 1112(a), then, it is appropriate to consider the common-law history of the manslaughter offense and its application to the circumstance of prenatal neglect by a mother that later results in the death of a child born alive.
 

 The common law of England recognized that a
 
 third party
 
 could be guilty of homicide for causing prenatal injuries to a mother or unborn child that resulted in the subsequent death of a child born alive. The principal debate in that situation concerned whether it was feasible to prove that prenatal acts caused the death of a live-born child. Lord Coke suggested that
 

 [i]f a woman be quick with childe, and by a Potion or otherwise killeth it in her wombe; or if a man beat her, whereby the childe dieth in her body, and she is delivered of a dead childe, this is a great misprision, and no murder: but if the childe be born alive, and dieth of the Potion, battery, or other cause, this is murder: for in law it is accounted a reasonable creature,
 
 in rerum natura
 
 , when it is born alive.
 

 3 Edward Coke,
 
 Institutes of the Laws of England
 
 50 (London, M. Flesher 1644). Others such as Hale and Lambard, "impressed by the difficulty of proving that the death of a live-born child was occasioned by a defendant's prenatal acts, took a different view from Coke." D. Seaborne Davies,
 
 Child-Killing in English Law
 
 , 1 Modern L. Rev. 203, 209 (1937);
 
 see
 
 1 Matthew Hale,
 
 The History of the Pleas of the Crown
 
 433 (London, E. & R. Nutt and R. Gosling 1736); William Lambard,
 
 Eirenarcha, or Of the Office of the Justices of Peace
 
 231 (London 1607 ed.) (1581). On the question whether proof of causation was legally possible, the law adopted Coke's position.
 

 Thus, in cases involving prenatal acts of a third party that caused the death of a child born alive, the common law recognized a crime of murder or manslaughter. In
 
 Rex v. Senior
 
 (1832) 168 Eng. Rep. 1298; 1 Mood. C.C. 346, the court upheld a manslaughter conviction for a male midwife who negligently compressed the head of an infant in the act of birth, thereby causing the child's death after he was completely born alive. The court in
 
 Regina v. West
 
 (1848) 175 Eng. Rep. 329; 2 Car. & K. 784, similarly instructed a jury that a defendant would be guilty of the murder of a child carried by another if she, "by a felonious attempt to procure abortion, caused the child to be brought into the world, for which it was not then fitted, and that the child did die in consequence of its exposure to the external world." 175 Eng. Rep. at 330. Such decisions led the Ninth Circuit to conclude that "it was well-established in common law that murder was the killing of one human being by another, and that an infant born alive that later died as a result of fetal injuries was a human being."
 
 United States v. Spencer
 
 ,
 
 839 F.2d 1341
 
 , 1343 (9th Cir. 1988).
 

 When it came to prosecutions of a mother, however, Coke's view did not prevail. The issue arose in two prominent cases under the law of England. In both decisions, courts ruled that a mother was not liable for manslaughter based on prenatal neglect that resulted in the death of a child born alive.
 
 Regina v. Knights
 
 (1860) 175 Eng. Rep. 952; 2 F. & F. 45, involved a mother who knew that she was about to give birth and wilfully abstained from taking the necessary precautions to preserve the life of the child after its birth. The prosecution urged that where the child died as a consequence of the alleged criminal neglect, the mother would be guilty of manslaughter. 175 Eng. Rep. at 953. The court, however, had "never heard such a
 doctrine" and ruled that the mother could not be convicted of manslaughter.
 

 Id.
 

 The British Parliament in 1874 then considered proposals to provide for the punishment of a mother guilty of culpable prenatal neglect resulting in death, but no such provision was enacted. Davies,
 
 supra
 
 , at 210.
 

 Thereafter, the decision in
 
 Rex v. Izod
 
 (1904) 20 Cox C.C. 690 (Eng.), reaffirmed the rule of
 
 Knights
 
 . The court rejected the prosecution's theory that "failure on the part of a woman to make proper provision for her expected confinement, resulting in the complete birth and subsequent death of a child, amounts to manslaughter."
 
 Id.
 
 at 691. To establish manslaughter by a mother, the court ruled, "neglect must be subsequent to the birth."
 
 Id.
 
 One leading treatise stated the common-law rule in the early twentieth century: "The mere failure on the part of a woman to make proper provision for her expected confinement, resulting in the complete birth and subsequent death of a child, is not sufficient in itself to warrant a conviction of manslaughter." 1 William Oldnall Russell,
 
 A Treatise on Crimes and Misdemeanors
 
 675-76 (William Feilden Craies & Leonard William Kershaw eds., 7th ed. 1910).
 

 The common law in early America was no different. A compilation of American and English cases through 1909 stated the law: "The wilful and negligent omission of a mother to care for herself or to make preparations for the birth of a child will not amount to manslaughter, although as a result of such neglect the child dies shortly after birth." 13
 
 The American and English Annotated Cases
 
 43 (William M. McKinley et al. eds., 1909). The few American cases on point followed the English common-law rule. In
 
 Brown v. State
 
 ,
 
 95 Miss. 670
 
 ,
 
 49 So. 146
 
 (1909), a woman gave birth in the toilet room of a train; the baby dropped to the ground through the stool and died after uttering a faint cry. The prosecution maintained that the mother was guilty of "such criminal negligence as to constitute manslaughter," but the Supreme Court of Mississippi ruled that the mother was not "guilty of any crime under the law."
 
 Id.
 
 at 147. As late as 1954, the Supreme Court of Wyoming addressed a contention by the State that a mother was guilty of manslaughter for her failure, prior to the birth of a child, to provide medical care for an infant to be born.
 
 State v. Osmus
 
 ,
 
 73 Wyo. 183
 
 ,
 
 276 P.2d 469
 
 , 474-75 (1954). The court reported that "
 
 no case decided in this country
 
 has been found going to the length of the contention of the state," and then applied the common-law rule of
 
 Knights
 
 and
 
 Izod
 
 that a mother is not guilty of manslaughter based on prenatal neglect causing the subsequent death of a child born alive.
 
 Id.
 
 at 475 (emphasis added).
 

 The 1909 federal manslaughter statute is best understood as incorporating this common-law meaning. "Unlike the homicide statutes in some modern penal codes that specifically define each element of the various degrees of criminal homicide, the federal homicide statutes simply adopt the language of the traditional common-law offenses of murder and manslaughter."
 
 United States v. Browner
 
 ,
 
 889 F.2d 549
 
 , 551 (5th Cir. 1989) (citations omitted). The Ninth Circuit, in upholding the murder conviction of a man whose attack on a pregnant woman caused the subsequent death of a child born alive, relied on "Congress's intent to reflect the state and common-law definition of murder" when it passed the homicide statutes in 1909.
 
 Spencer
 
 ,
 
 839 F.2d at 1343
 
 .
 
 Accord
 

 United States v. Serawop
 
 ,
 
 410 F.3d 656
 
 , 666 (10th Cir. 2005) (concluding that the federal manslaughter statute should be read "in accordance ... with the history of the common law");
 
 United States v. Sargent
 
 ,
 
 18 M.J. 331
 
 , 336 (C.M.A. 1984) (explaining that the Manual for Courts-Martial
 adopted the federal statutory definition of manslaughter, which is "declaratory of the common law"). The limited legislative history of the provision, insofar as it should be considered, suggested no intent to expand the meaning to encompass a mother's prenatal acts: Manslaughter was "defined and classified in language similar to that to be found in the statutes of a large majority of the States." H.R. Rep. No. 2, 60th Cong., 1st Sess., at 24 (1908).
 

 Later enactments did not change the meaning of manslaughter in § 1112(a). The Born-Alive Infants Protection Act, enacted in 2002, affirms that the term "human being" in the manslaughter statute includes "every infant member of the species homo sapiens who is born alive at any stage of development."
 
 1 U.S.C. § 8
 
 (a). The common law, however, already recognized that an infant born alive is a human being who could be the victim of manslaughter, yet the law did not make a mother guilty of manslaughter based on prenatal acts. The 2002 statute does not address a mother's liability under the manslaughter statute. The Unborn Victims of Violence Act of 2004,
 
 18 U.S.C. § 1841
 
 , likewise does not broaden the manslaughter statute beyond its original meaning.
 

 The majority responds that the common-law meaning of manslaughter "does not fit" with the federal manslaughter statute.
 
 Ante
 
 , at 590 n.1. Of course, "we do not assume that a statutory word is used as a term of art where that meaning does not fit," and we "do not force term-of-art definitions into contexts where they plainly do not fit and produce nonsense."
 
 Johnson v. United States
 
 ,
 
 559 U.S. 133
 
 , 139-40,
 
 130 S.Ct. 1265
 
 ,
 
 176 L.Ed.2d 1
 
 (2010) (internal quotation omitted). So when Congress created the new statutory term "violent felony" and defined it to mean a crime with an element of using "physical force" against another person, the common-law meaning of "force" would have been a "comical misfit."
 
 Id
 
 . at 139,
 
 130 S.Ct. 1265
 
 . That was so because the common-law meaning of "force" encompassed "even the slightest offensive touching," which obviously was not "violent."
 
 Id.
 
 at 145,
 
 130 S.Ct. 1265
 
 . But here, Congress did not coin any new term; it simply criminalized the traditional offense of "manslaughter" and gave it the common-law definition that dates to Blackstone. In that situation, the statutory words and the common-law meaning fit hand in glove. This case no doubt depends on the "express statutory language,"
 
 ante
 
 , at 590 n.1, but the question is what the language
 
 means
 
 . As a unanimous Supreme Court reaffirmed just last month, "[w]hen a statutory term is 'obviously transplanted from another legal source,' it 'brings the old soil with it.' "
 
 Taggart v. Lorenzen
 
 , --- U.S. ----,
 
 139 S. Ct. 1795
 
 , 1801, --- L.Ed.2d ---- (2019) (quoting
 
 Hall v. Hall
 
 , --- U.S. ----,
 
 138 S. Ct. 1118
 
 , 1128,
 
 200 L.Ed.2d 399
 
 (2018) (quoting Felix Frankfurter,
 
 Some Reflections on the Reading of Statutes
 
 ,
 
 47 Colum. L. Rev. 527
 
 , 537 (1947))).
 

 In sum, the common-law meaning of manslaughter did not encompass prenatal neglect by a mother that later caused the death of her child born alive. Research reveals no decision in England or the United States before 1909 holding that a mother's prenatal neglect constituted manslaughter. Congress in 1909 adopted the common-law definition of manslaughter in § 1112(a) ; nothing in the statute dictates that its scope is broader than the common-law meaning. No federal statute enacted after 1909 has expanded the manslaughter statute to encompass a mother's prenatal neglect.
 

 This case raises profound moral and policy questions, but it requires an Act of Congress to extend federal criminal liability to a mother whose drug use during
 pregnancy causes the death of her child. I conclude that under present law, the government's allegations against Samantha Flute do not state an offense, and the district court's order dismissing the indictment should be affirmed.
 

 As enacted in 1909, the words defining involuntary manslaughter appeared in a slightly different order: "In the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." Act of March 4, 1909, ch. 321, Pub. L. No. 60-350, § 274,
 
 35 Stat. 1088
 
 , 1143. The phrase "of a lawful act which might produce death" was moved to the end of the sentence in 1948.
 
 See
 
 Act of June 25, 1948, ch. 645, § 1112(a),
 
 62 Stat. 683
 
 , 756. A Reviser's Note to the 1948 version stated that "[m]inor changes were made in phraseology."
 
 18 U.S.C. § 1112
 
 (a) reviser's note (Supp. III 1950).